David B. STRATTON, Trustee for the Estates of First American Mortgage Company, Inc., etc., Plaintiff,

v.

EQUITABLE BANK, N.A., Defendant.

Civ. No. H–88–1485.

United States District Court, D. Maryland.

Sept. 12, 1989.

John E. James, William J. Marsden, Jr., William R. Denny, and Potter, Anderson & Corroon, Wilmington, Del., and David Freishtat and Freishtat & Sandler, Baltimore, Md., for plaintiff.

Michael D. Colglazier, John H. Culver, III, and Hogan & Hartson, Baltimore, Md., for defendant.

ALEXANDER HARVEY, II, Chief Judge.

This civil action is yet another of the many suits instituted as adversary proceedings in the United States Bankruptcy Court for the District of Maryland by the Trustee in Bankruptcy of First American Mortgage Company, Inc. (hereinafter "FAMCO II" or "the debtor").[1] By Order of this Court, reference of this case was withdrawn pursuant to 28 U.S.C. § 157(d).[2] Presently pending before the Court in this case are cross motions for summary judgment or partial summary judgment filed by the parties.

In opinions previously filed in related cases, this Court has recounted in some detail the pervasive fraudulent conduct of Michael H. Clott which ultimately led to the bankruptcy of FAMCO II. See E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A., 678 F.Supp. 567 (D.Md.1988) (hereinafter "the Hutton Opinion"); First Federal Savings & Loan Association of Brainerd v. Equitable Bank, Civil No. H–86–301 1988 WL 167703 (Memorandum and Order of April 5, 1988) (hereinafter "the First Federal Savings Opinion"); E.F. Hutton Mortgage Corp. v. Pappas, 690 F.Supp. 1465 (D.Md.1988) (hereinafter "the Pappas Opinion"); Stratton v. Sacks, 99 B.R. 686 (D.Md.1989) (hereinafter "the Sacks Opinion"); Stratton v. Clott, Civil No. H–88–779 1989 WL 123262 (Memorandum and Order of May 10, 1989) (hereinafter "the Clott Opinion"); Zolfaghari v. Clott, Civil No. H–87–2633 1989 WL 90266 (Memorandum Opinion of May 22, 1989); and Stratton v. Miller, Civil No. H–89–751 1989 WL 123266 (Memorandum Opinion of May 30, 1989) (hereinafter "the Miller Opinion"). Reference is hereby made to those Opinions for a discussion of the circumstances which led to the demise of FAMCO II and to Clott's imprisonment on charges of criminal fraud and racketeering.

In filing numerous suits against various individuals and corporate entities, the Trustee of FAMCO II has been attempting to recoup for the benefit of creditors losses suffered by them as a result of Clott's fraudulent and criminal activities. In Stratton v. Sacks, supra, the Trustee sued Leonard Sacks and his accounting firm of Buxbaum, Sacks, P.A., asserting claims of negligence and breach of contract.[3] In Stratton v. Clott, supra, the Trustee sought recoveries from corporate insiders of FAMCO II and sued virtually every officer, director and shareholder of the corporation.[4] In Stratton v. Miller, supra, the Trustee sued the attorneys for FAMCO II, including various partners of the law firm of Semmes, Bowen & Semmes, asserting claims of negligence, breach of contract and aiding and abetting fraud.[5] In this particular case, the Trustee has sued defendant Equitable Bank, which served as the banker for both FAMCO I and FAMCO II.

As amended from time to time, plaintiff's complaint ultimately contained 22 counts. Defendant Equitable has answered and filed a 5 count counterclaim. Pretrial proceedings have been extensive. The parties have available voluminous discovery undertaken in this case and in prior related litigation involving FAMCO II and Clott. Presently before the Court are three motions for summary judgment or for partial summary judgment filed by defendant Equitable and one motion for partial summary

---

1. As explained more fully herein, Michael H. Clott at different times formed two corporations bearing the same name. They will be referred to as FAMCO I and FAMCO II, respectively. Both are debtors in the bankruptcy proceedings.

2. Three other suits which were likewise filed by the Trustee in the Bankruptcy Court as adversary proceedings were also withdrawn and have been or are still pending in this Court. Stratton v. Sacks, Civil No. H–88–614, Stratton v. Clott, Civil No. H–88–779 and Stratton v. Miller, Civil No. H–89–751.

3. For the reasons set forth in the Sacks Opinion, summary judgment was entered in favor of the defendants in that case.

4. Defaults have been entered against Clott and several other defendants in Stratton v. Clott, supra, and the Trustee has settled his claims against most of the other defendants in that case. A trial involving two remaining defendants has been scheduled for October 2, 1989.

5. For the reasons set forth in the Miller Opinion, summary judgment was entered in favor of the defendants in that case.

judgment filed by plaintiff. Memoranda and numerous affidavits and exhibits have been submitted in support of and in opposition to the pending motions. Oral argument has been heard in open Court.

Following its exhaustive review of the massive record in this case, this Court has concluded that defendant's motions for summary judgment should be granted and that plaintiff's motion for partial summary judgment should be denied. Since defendant Equitable is not entitled to an affirmative recovery, its counterclaim will be dismissed. Despite his persistent efforts to locate a "deep pocket" for recoupment of some of the unfortunate losses which creditors have sustained as a result of Clott's fraudulent and criminal activity, the Trustee, as in the suits he brought against the debtor's accountants and lawyers, must fail in his efforts here to obtain a recovery from the banker for FAMCO I and FAMCO II. The facts of record here do not as a matter of law support any of the claims which have been asserted.

I

## BACKGROUND FACTS

A full recounting of the facts concerning the formation of both FAMCO I and FAMCO II, their operations and their eventual demise have been set forth in prior opinions of this Court in related litigation and will not be repeated in detail here. The Court will, however, recount herein some of the facts pertaining to the debtor's banking relationship with defendant Equitable.

FAMCO I, FAMCO II and their subsidiaries and affiliates were in the business of lending money and taking as security second and third mortgages on borrowers' residences. These were extremely high risk loans made to individuals with poor credit backgrounds. The debtors charged extremely high rates of interest in addition to substantial servicing fees. Equitable was banker for both FAMCO I and FAMCO II. Numerous bank accounts were maintained at Equitable by FAMCO I and FAMCO II and by subsidiaries and affiliates. Between 1983 and 1985, Equitable extended credit or otherwise loaned millions of dol-

lars to FAMCO II for its operations. At various times during the debtor's existence, E.F. Hutton Mortgage Corporation (hereinafter "Hutton") was the principal entity which provided funds to the debtor to be lent to borrowers. At other times, Equitable was the primary source of these funds.

As the record here shows, there were at different times two corporations known as First American Mortgage Company, Inc. In 1979, Clott formed the first such corporate entity (referred to herein as "FAMCO I"), and he alone owned all of the outstanding stock of this corporation. In October of 1982, FAMCO I was renamed MH Mortgage Company, Inc. (hereinafter "MH Mortgage"). A new corporation bearing the same name, First American Mortgage Company, Inc. (referred to herein as "FAMCO II"), was then formed. Additional stockholders joined Clott in the formation of FAMCO II. At the outset, Clott owned 49% of the outstanding stock of FAMCO II while five other individuals owned the other shares. In March of 1984, Clott became the owner of 51% of the outstanding stock of FAMCO II, with four other stockholders owning 12–1/4% each.

Throughout the corporate life of FAMCO II, Clott controlled the corporation, its subsidiaries and its affiliates. He was the dominant figure in operating and managing the business of the various debtors, and all major decisions were made by him. At Clott's direction, corporate funds were from time to time transferred from FAMCO II to MH Mortgage (which remained wholly owned by him) and to other entities. Other directors had little to do with the business operations of FAMCO II and were not aware of the magnitude and extent of the fraudulent activity which was at the very core of the debtor's corporate existence.

As Chairman and Chief Executive Officer of these various corporate entities, Clott, operating through FAMCO II, defrauded both large and small corporate institutions during the years 1983 to 1985, as well as countless numbers of individual in-

vestors. Both Hutton and Equitable suffered substantial losses as a result of Clott's fraudulent and criminal activities. Shortly after the bankruptcy of FAMCO II, each accused the other of participating in Clott's frauds. In the *Hutton* case, this Court concluded that there was no credible evidence of actionable wrongdoing by either Equitable or Hutton. 678 F.Supp. at 572. Although Equitable had learned of various irregularities in the debtor's operations and although some of its employees may have suspected that Clott was engaged in fraudulent activity, Equitable had no knowledge of actual fraud on the debtor's part. As the Court noted in the *Hutton* case, it would have made little sense for Equitable with knowledge that it was being defrauded to have continued to lend large sums of money to Clott and the corporations he controlled until shortly before bankruptcy proceedings were instituted. 678 F.Supp. at 580.

It was during the summer of 1985 that FAMCO II began to experience serious financial difficulties. Hutton had restricted its purchases of mortgages, and Equitable had been hesitating to extend further credit to Clott and his corporate entities. Negotiations between Equitable and Clott concerning a possible merger, acquisition or other joint enterprise failed. In July 1985, Equitable and FAMCO II entered into the so-called Mortgage Sale Service and Repurchase Agreement (hereinafter "the MSSR"). Through the MSSR, Equitable agreed to lend funds to FAMCO II for the purpose of originating mortgage loans; FAMCO II would then use the funds provided to originate new loans, and FAMCO II would then sell the loans to Equitable to be held as collateral for sums borrowed by the debtor. FAMCO II agreed to provide servicing for these mortgage loans, by collecting payments of principal and interest (including prepayments) and making monthly remittances or advances to Equitable. Under the agreement, FAMCO II was to attempt to locate ultimate purchasers of these loans.

Between July of 1985 and FAMCO II's cessation of operations on November 15, 1985, Equitable advanced more than $15 million to the debtor, either under the MSSR or as so-called Working Capital Loans (hereinafter the "WCL"). The WCL consisted of two loans made by Equitable to FAMCO II in October and November of 1985. On or about October 9, 1985, Equitable made a $1.5 million loan to FAMCO II, and on November 4, 1985, Equitable advanced an additional $400,000. The WCL was secured by mortgages held by Equitable in its FAMCO II portfolio and by a confessed judgment note executed by Clott and his wife individually. Sums loaned under both the MSSR and the WCL were advanced so that FAMCO II might continue its business operations. When evidence of irregularities and possible fraud came to the attention of Equitable, it declined to extend further credit to Clott and his various entities, and bankruptcy proceedings were commenced shortly thereafter.[6]

Clott was later charged with criminal fraud and racketeering in two separate indictments returned in this Court. He pled guilty and was subsequently sentenced to 12-½ years imprisonment. Two other officers of FAMCO II, namely Jerry L. Gaultney and Thomas J. Polvinale, also entered pleas of guilty to charges of criminal fraud and have also been sentenced by a judge of this Court. George Schnabel, another officer, was convicted by a jury in this Court of criminal fraud and has also been sentenced. Gaultney had been President of FAMCO II, Polvinale had been its Chief Financial Officer, and Schnabel was an Executive Vice President.

Equitable has previously been sued in this Court not only by Hutton but also by certain institutional investors of FAMCO II. Civil actions were brought against Equitable by First Federal Savings & Loan Association of Brainerd, Yankton Savings & Loan Association, Pioneer Federal Savings & Loan Association and Yankee Bank

---

6. By Order of the Bankruptcy Court dated July 31, 1986, the Chapter 11 proceedings were converted to Chapter 7.

for Finance & Savings. *See* Civil Nos. H–85–4708, H–86–301 and H–86–3531. In the *First Federal Savings* Opinion of April 5, 1988 entered in Civil Nos. H–86–301 and H–86–3531 1988 WL 167703, this Court concluded that Equitable was entitled to summary judgment as to the claims of fraud and breach of fiduciary duty asserted against it by these savings and loan associations. This Court there determined that no actionable fraud existed because the evidence indicated that FAMCO II had fraudulently persuaded Equitable to make improper transfers of the plaintiffs' funds and that Equitable had acted to protect the plaintiffs' interests when it discovered the deception. (Slip Op. at 21). This Court further concluded that the plaintiffs' claims of breach of contract and negligence could not be finally determined in those suits by way of a motion for summary judgment. Those claims were accordingly scheduled for trial. Thereafter, all four of the savings and loan associations in question settled before trial their disputes with Equitable.

## II

### SUMMARY JUDGMENT PRINCIPLES

The principles of law pertinent to the granting or denial of a motion for summary judgment pursuant to Rule 56, F.R.Civ.P., are well known and have been set forth in some detail in previous opinions of this Court filed in FAMCO–related cases. Nevertheless, it will be helpful for a fuller understanding of the decisions reached in this case for the Court to repeat its previous discussion.

One of the purposes of Rule 56 is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that a defendant may be liable under the claims alleged. *See* Rule 56(e). The same rules apply when a defendant is opposing a plaintiff's motion for summary judgment. Moreover, " '[a] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might

rely.' " *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theaters, Inc.,* 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967)). In the absence of such a minimal showing, a defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. As Judge Winter said in *Bland v. Norfolk and Southern Railroad Company,* 406 F.2d 863, 866 (4th Cir.1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, *i.e.,* any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

In two recent cases, the Supreme Court has had an opportunity to clarify and expand the principles applicable to a trial court's consideration of a summary judgment motion filed under Rule 56. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson,* the Supreme Court held that the standard for granting a summary judgment motion under Rule 56 is the same as that for granting a directed verdict under Rule 50, F.R.Civ.P. 477 U.S. at 250–51, 106 S.Ct. at 2511–12. The Court explained this standard as follows:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. at 2512 (emphasis added).

In *Catrett,* the Court held that there is "no express or implied requirement in Rule

56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S. at 323, 106 S.Ct. at 2552 (emphasis in original). In reaching this result, the Court observed:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.P.; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984).... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555.

The Fourth Circuit discussed in *Felty v. Graves–Humphrey Co.*, 818 F.2d 1126 (4th Cir.1987), the Supreme Court's holdings in *Anderson* and *Catrett*. Judge Wilkinson emphasized in *Felty* that trial judges have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Id.* at 1128 (quoting *Celotex, supra,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53).

Applying these principles to the facts of record here, this Court concludes that the motions for summary judgment or partial summary judgment of defendant Equitable must be granted, and that plaintiff's motion for partial summary judgment must be denied. Since the facts of record here "taken as a whole could not lead a rational trier of fact to find for [plaintiff Trustee]," there is no genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III

### THE CLAIMS

In its Fourth Amended Complaint, plaintiff Trustee has asserted 22 different claims against defendant Equitable. Although the claims of the Trustee and the defenses asserted in the *Sacks* case and in the *Miller* case were similar, those presented here are quite different. All but one of plaintiff's claims are based on provisions of the Bankruptcy Code. Only Count I, based on a theory of conversion, arises under Maryland law.

The Fourth Amended Complaint contains a veritable laundry list of theories asserted under bankruptcy law whereby the Trustee seeks to recoup from defendant Equitable losses sustained by creditors. It appears that counsel for the Trustee has combed the Bankruptcy Code in search of provisions which might possibly permit him to obtain a recovery from the banking institution which did business with Clott during the life of FAMCO I and FAMCO II. Claims have been asserted under 11 U.S.C. § 510(c), § 544(b), § 547(b), § 547(c)(1), § 547(c)(2), § 548(a)(1), § 548(a)(2) and § 548(c). Claims have also been advanced under Maryland commercial law including Md. Comm. Law Code Ann., § 3–419(1)(c) and §§ 15–204 to 15–207. But more than an array of legal theories is needed to withstand the well-supported motions for summary judgment filed herein by defendant Equitable. In spite of persistent attempts, the Trustee has not been able to shoehorn material facts of record into any viable legal theory which would permit a recovery against defendant Equitable. As indicated by previous opinions of this Court, losses sustained by creditors of FAMCO I and FAMCO II were caused essentially by Clott's fraudulent and criminal activities. In spite of the voluminous discovery available, plaintiff Trustee has not been able to point to material facts in the record which would defeat, as to any of the counts before the Court, defendant's motions for summary judgment.

Of the 22 counts contained in the Fourth Amended Complaint, the Trustee has agreed to a dismissal of five of those

counts, namely Counts II, V, VI, VIII and XVIII. For purposes of analysis, the remaining 17 counts can be conveniently separated into four categories. The first category consists solely of Count I which alleges conversion by Equitable of certain checks in violation of Maryland commercial law. Second, ten counts (namely, Counts IX through XVII inclusive and Count XXII) allege fraudulent conveyances by the debtor to defendant Equitable in violation of federal bankruptcy and state commercial law. Third, two of the counts (namely, Counts III and IV) seek under bankruptcy law recharacterization and equitable subordination of certain transfers made by the debtor to Equitable. Finally, four counts (namely, Counts VII, XIX, XX and XXI) seek to avoid certain payments made by the debtor to Equitable on the ground that they constitute preferences under the Bankruptcy Code.

There are four motions for summary judgment pending before the Court. Defendant Equitable first moved for partial summary judgment as to Counts I through IV inclusive, Counts IX through XVII inclusive, Count XIX and Count XX. (Paper No. 41). Thereafter, Equitable filed a motion for summary judgment as to all remaining claims asserted by the Trustee in the Third Amended Complaint. (Paper No. 52). The Trustee then filed a motion for partial summary judgment as to Count I and as to all counts of Equitable's counterclaim. (Paper No. 53). Most recently, Equitable sought summary judgment as to Count XXII of the Fourth Amended Complaint. (Paper No. 68).

When the facts contained in this massive record are considered in the light of applicable summary judgment principles, this Court finds and concludes as a matter of law that plaintiff Trustee is not entitled to a recovery from defendant Equitable under any of the claims asserted. In view of the Court's rulings, defendant's counterclaim will be dismissed.

**7.** One of the checks in question was made payable "to cash." Accordingly, this check constituted bearer paper that legally could be in-

## VI

## CONVERSION (COUNT I)

■ In Count I, the Trustee seeks to recover some $1.2 million from defendant Equitable based upon the alleged conversion by Equitable of 311[7] checks made payable to FAMCO II. Specifically, the Trustee asserts that beginning in June 1983 and continuing into 1985, Equitable accepted for deposit in the MH Mortgage account checks which were made payable to FAMCO II but which were not endorsed by FAMCO II. The Trustee contends that since these checks were payable to FAMCO II but bore indorsements of only MH Mortgage, payments by Equitable were commercially unreasonable and constitute a violation of Md. Comm. Law Code Ann. § 3–419(1)(c) (1975). The Trustee asserts that he is entitled to recover on behalf of the debtor the face value of these checks and accrued interest.

Both sides have moved for summary judgment as to Count I. Relying on *Mid-Atlantic Tennis Courts, Inc. v. Citizens Bank & Trust Co.,* 658 F.Supp. 140 (D.Md. 1987) (Smalkin, J.), the Trustee argues that Equitable's payment of these checks into an account other than that of the named payee is, as a matter of law, commercially unreasonable conduct and that Equitable is accordingly liable for the amounts deposited. For the reasons stated herein, defendant Equitable cannot under the circumstances of this case be found liable for conversion of these checks. Since defendant Equitable is entitled to summary judgment as to Count I, the Trustee's motion in turn must be denied.

■ Pursuant to § 3–419(1)(c), a negotiable instrument is converted when it is paid on a forged or otherwise unauthorized indorsement. For example, a bank may be liable for conversion when it permits the deposit of a check into a third-party's account over the missing or unauthorized indorsement of the named payee. *See Mid-Atlantic,* 658 F.Supp. at 143; *Taylor v.*

dorsed by anyone. The Trustee has withdrawn his claim based on this check.

*Equitable Trust Co.*, 269 Md. 149, 157, 304 A.2d 838 (1973). In this case, the indorsement of "FAMCO," the named payee, was not made on the checks before the indorsement over to "MH Mortgage." It is well established, however, that a bank may affirmatively demonstrate the good faith or commercial reasonableness of its actions within a particular factual context. *See* § 3–419(3); *Taylor, supra.* In this particular case, this Court concludes as a matter of law that it was not commercially unreasonable for defendant Equitable to accept these checks for deposit in the MH Mortgage account even though there was no FAMCO indorsement.

Teresa Tursk, Clott's personal secretary, testified at her deposition that deposits of FAMCO II checks into the MH Mortgage account were an acknowledged and common practice. Turek noted that, at one point in time, she did place FAMCO indorsement on the checks and then further indorsed the checks for deposit into the MH Mortgage account. Some time in late 1984, however, she was informed by Hennie Chase, FAMCO II's treasurer, that the checks no longer needed a FAMCO indorsement and that Turek could merely stamp the name of the account into which the deposit was being made. Turek did just that, placing "MH Mortgage" on the back of all the checks in question.

The testimony of Hennie Chase herself further supports the finding that transfers from FAMCO II accounts into the MH Mortgage account were conducted as a part of everyday business of the debtor. FAMCO II apparently paid points for MH Mortgage loans which would be booked as a receivable from MH Mortgage. Checks were made payable to MH Mortgage for expenses of FAMCO II originally paid for by MH Mortgage. Also, funds would occasionally be transferred to MH Mortgage to cover payments on MH Mortgage loans which had been mistakenly deposited into a FAMCO II account. Mistakes of this sort were understandable since MH Mortgage had been FAMCO I before its name was changed in 1982.

In his deposition, Michael Clott testified that, while there was no formal directive to employees to deposit checks payable to FAMCO II into the MH Mortgage account, he gave instructions on various occasions that such deposits be made. He also testified that Turek was aware that checks made out by investors generated by FAMCO I, even though payable to FAMCO II, should be deposited into the MH Mortgage account.

Evidence of record here therefore establishes that FAMCO II authorized the checks in question to be indorsed over to the MH Mortgage account. Indeed, these checks were negotiated in this manner for almost two years, without comment or objection from officers of either FAMCO I (MH Mortgage) or FAMCO II. Since the officers of the two corporations themselves were entirely satisfied with the handling and depositing of these checks, the Trustee is hardly entitled to claim that it was commercially unreasonable for Equitable to accept these checks for deposit.

In opposing defendant's motion, the Trustee has done little more than point to minor discrepancies in the deposition testimony of Turek and Chase and also attack the testimony of Clott in its entirety on grounds of credibility. As counsel for plaintiff conceded at oral argument, questions of credibility are not appropriate for consideration by a court in ruling on a motion for summary judgment. In this record, Clott's deposition testimony stands unrefuted. Plaintiff cannot here point to material facts of record to contradict what the evidence shows, namely that the debtor authorized the course of conduct followed.

■ Indeed, the Trustee's argument appears to be essentially a legal one. The Trustee asserts that the defense of actual or apparent authority is not legally germane to a finding of conversion liability in Maryland. The Trustee's reliance on the *Mid–Atlantic* decision is, however, misplaced. Judge Smalkin there held merely that a defense of actual or apparent authority by an agent to negotiate checks is irrelevant when there is absolutely no title indorsement or signature on the checks

whatsoever. 658 F.Supp. at 143. In the present case, all the checks in question were indorsed by Turek to the order of "MH Mortgage." Under Maryland law, Equitable is entitled to show that Turek had the actual or apparent authority to negotiate these checks in this manner on behalf of FAMCO II. *See Bank of Southern Maryland v. Robertson's Crab House, Inc.*, 39 Md.App. 707, 716–17, 389 A.2d 388 (1978).

In sum, the Trustee has failed to come forward with any evidence whatsoever to counter Equitable's showing that Turek was authorized by officers of the debtor to indorse these checks over to MH Mortgage. Since Turek had received corporate authorization for the indorsement of these checks over to MH Mortgage, and since Equitable did not have knowledge of any improper purpose on the part of FAMCO's officers, *see* the *Hutton* Opinion, 678 F.Supp. at 580, Equitable cannot be held liable for accepting the checks for deposit into the MH Mortgage account.

In any event, even if the checks were properly payable only to FAMCO II and not to FAMCO I (MH Mortgage), it is apparent that the proceeds of these checks were readily accessible to FAMCO II and that FAMCO II eventually received the benefit of these checks.[8] Maryland courts have recognized a "qualification" of the general rule concerning unauthorized indorsements which is applicable in this case. In *Coplin v. Maryland Trust Co.*, 222 Md. 119, 123, 159 A.2d 356 (1959), the Court of Appeals stated:

[I]f the person entitled to receive the proceeds actually receives them or the benefit of them, the drawer has suffered no loss and the technical breach of duty by the bank has occasioned no harm.

*Id.* (citations omitted). *See also Perini Corp. v. First National Bank*, 553 F.2d 398, 412–13 (5th Cir.1977).

As shown by the record here, any payments which were made into the MH Mortgage account were commingled with funds in the accounts of FAMCO II to such a degree that tracing would be impossible.[9] FAMCO II, acting through Clott, commingled all the monies it received, whether on account of borrower payments, borrower prepayments, income from loan originations, or new investor funds. Because Clott regularly transferred funds freely back and forth among the over 40 checking accounts maintained at Equitable by FAMCO II, its subsidiaries and affiliates, Clott could at any time have transferred monies from any FAMCO II account into the MH Mortgage account. Indeed, Clott regularly did precisely that; he signed FAMCO II checks transferring corporate funds to MH Mortgage and eventually into his own pockets. Of course, simultaneously he was undertaking the other fraudulent activities which converted FAMCO II "into an engine of theft against outsiders." *See* the *Sacks* Opinion, 99 B.R. at 696.

Thus, FAMCO II was not in any event damaged by any wrongful deposit of these checks into the MH Mortgage account. The cause of the debtor's losses was not Equitable's lack of due care but the fraudulent activities of Clott. *See Taylor*, 269 Md. at 159, 304 A.2d 838. FAMCO II, acting through Clott, had ready access to the monies in issue, no matter in which account they were deposited. Whether or not Equitable acted in a commercially unreasonable manner pursuant to § 3–419(1)(c), it is mere conjecture to conclude that Clott's diversions of monies would have been prevented if the checks had been deposited in bank accounts of FAMCO II and that additional funds would then have been available for the creditors. *See* the *Sacks* Opinion, 99 B.R. at 696.

For all these reasons, this Court concludes that Equitable's motion for summa-

---

8. Equitable points to evidence indicating that many of the checks in question were drawn by investors of FAMCO I, *i.e.*, MH Mortgage, and that therefore the proceeds of these checks reached their intended payee. *See Coplin v. Maryland Trust Co.*, 222 Md. 119, 123, 159 A.2d 356 (1959).

9. Plaintiff, as Trustee in bankruptcy for both FAMCO II and FAMCO I (MH Mortgage), has possession and control of the bank accounts of both corporate entities.

ry judgment as to Count I must be granted, and that the Trustee's own motion for partial summary judgment as to Count I must be denied.

## V

## FRAUDULENT CONVEYANCES

### (COUNTS IX THROUGH XVII)

In nine counts of the Fourth Amended Complaint, the Trustee seeks to avoid, pursuant to provisions of the Bankruptcy Code, three pre-petition payments made by FAMCO II to Equitable.[10] The Trustee relies essentially on two different legal theories. First, the Trustee seeks to avoid these transfers under 11 U.S.C. § 548 as fraudulent conveyances. Second, the Trustee argues that these prepayments are avoidable under 11 U.S.C. § 544(b), which grants a trustee in bankruptcy the same power to avoid fraudulent transfers that an unsecured creditor has under state law. In support of this second theory, the Trustee relies on provisions of the Maryland Uniform Fraudulent Conveyances Act, Md. Comm. Law Code Ann. §§ 15–204—15–207 (1983).

The three payments in question are evidenced by three deposit slips of Equitable, bearing dates in August and October of 1985. The deposit slips are attached to checks which denote prepayments [11] of certain mortgage loans, namely, those of Marshall Pickard, Carl Cummings and Richard Skafte. Because Equitable held the notes on these loans pursuant to the MSSR, Equitable argues that these payments were rightfully paid over to it by FAMCO II and cannot now be avoided by the Trustee.

The Trustee challenges Equitable's right to receive these payments on the ground that these 1985 payments were made on account of mortgage loans which were in

default or were worthless because they had already been paid off. Because FAMCO II had no obligation to make payments on worthless loans, the Trustee contends that an issue of material fact arises as to whether these 1985 payments were fraudulently made by the debtor to Equitable with consequent loss to other creditors.

In asserting these nine claims, the Trustee relies exclusively on his Exhibit 43, which contains an undated, FAMCO–generated computer printout of various mortgage loans. According to the Trustee, the column on the printout that is entitled "PDTO" indicates the months in which these loans were paid off. The computer printout, says the Trustee, shows the Cummings loan to have been paid off in May 1984, the Pickard loan to be in default as of March 1984, and the Skafte loan to have been paid off in October 1984.

After a review of the entire record here, this Court concludes that the Trustee has failed to come forward with sufficient probative evidence to support the legal theories advanced. Accordingly, summary judgment in favor of defendant Equitable will be granted as to Counts IX through XVII.

### (a)

### *Property of the Debtor*

Title 11 U.S.C. § 547(b) empowers the Trustee to avoid certain transfers "of property of the debtor." Section 548(a) empowers the Trustee to avoid "any transfer of an interest of the debtor in property" if the transfers meet certain conditions. Contending that the three payments in question do not constitute transfers of property of the debtor, Equitable points out that the payments made to it by the debtor were contemporaneous pass-throughs of borrower prepayments owed to

10. The Trustee has altered the claimed basis for the recovery sought under Counts IX through XVII. At an earlier stage of the proceedings, the Trustee argued that FAMCO II made certain monthly advancements to Equitable, as well as other payments, upon loans which were paid off or in default. Now, the Trustee seeks recovery only on the basis of three pre-payments made by borrowers to FAMCO II, which were then

paid over to Equitable pursuant to the terms of the MSSR.

11. As indicated in opinions filed in other FAMCO-related litigation, payments of principal made before the due date by a borrower of a mortgage loan originated by FAMCO II have been termed "prepayments."

Equitable by FAMCO II pursuant to the MSSR.

However, even though Equitable owned the mortgage loans and had the right to receive prepayments on these loans directly from the borrowers, these three prepayments were first deposited into the "FAM Mortgage Servicing Paid–in–Full" account. This was an ordinary FAMCO II checking account, over which the debtor had control. Thus, even if these funds did not initially belong to FAMCO II, they were deposited in accounts owned and controlled by FAMCO II. Therefore, these funds constitute property of the debtor's estate within the meaning of § 547(b) and § 548(a).

### (b)

### *Section 548*

Section 548 authorizes the Trustee to avoid transfers "of an interest of the debtor in property" made within one year of the date of filing of the bankruptcy petition. Two categories of avoidable transfers are set forth in § 548(a). A conveyance may be fraudulent either (1) if it was made with "actual intent to hinder, delay, or defraud" an existing or subsequent creditor, (*i.e.*, whether or not the transferor was insolvent at the time), or (2) if the transferor was insolvent (or likely to become insolvent) and received "less than reasonably equivalent value" in exchange for the transfer (*i.e.*, whether or not the transferee had a wrongful intent). The Trustee argues that the transfers in question were fraudulent in both respects.

### (1) *Section 548(a)(1)*

■ A transfer may be fraudulent and therefore avoidable, if it was made by the debtor with actual intent to hinder, delay, or defraud persons to whom the debtor was or later became indebted. § 548(a)(1). As evidence of wrongful intent on the part of FAMCO II, the Trustee relies on this Court's earlier determination that Clott operated a Ponzi-type scheme to defraud Hutton and other purchasers of its mortgage loans by having them buy delinquent or defaulted loans and then using these funds to generate yet more mortgage loans. *See* the *Hutton* Opinion, 678 F.Supp. at 574. According to the Trustee, such a finding establishes as a matter of law that FAMCO II possessed the actual intent to hinder, delay, or defraud subsequent creditors in forwarding these prepayments to Equitable.

■ Actual intent to defraud a creditor must be proven by clear and convincing evidence. *See United States v. Gleneagles Investment Co.*, 565 F.Supp. 556, 580 (M.D. Pa.1983) (applying Pennsylvania law as to fraud); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 334, 439 A.2d 534 (1982). Moreover, a conveyance will not be set aside under § 548(a)(1) if the transferee (in this case Equitable) was without knowledge of the fraud and paid a fair consideration for the conveyance. *Id.* "[I]t is insufficient to show only that a transfer had the *effect* of defrauding certain creditors or that the transfer was made in preference to other creditors; 'actual *intent*' to defraud must be shown." *In re Prestige Spring Corp.*, 628 F.2d 840, 842–43 (4th Cir.1980) (citations omitted) (emphasis added).

The Trustee relies on *In re Independent Clearing House Co.*, 77 B.R. 843 (D.Utah 1987) in support of his contention that the debtor's actual intent to defraud later creditors has been established as a matter of law by this Court's earlier decision in the *Hutton* case. However, the facts in the *Independent* case are markedly different from those present here. There, the trustee was permitted to avoid payments made by the fraudulent debtors in excess of the amount paid to the debtors by earlier investors. Such payments, reflecting fictitious profits, inevitably had a detrimental effect on later investors. The *Independent* Court allowed the investors who were defendants in that case to keep that portion of the payments made to them up to the amount of their initial outlay, but no more, because to that extent, such investors had given reasonably equivalent value. *Id.* at 857.

In this case, the sums forwarded to Equitable were transferred pursuant to an obligation undertaken by the debtor under the MSSR, a valid contract between the parties. The MSSR was negotiated between FAMCO II and Equitable to provide funds for the continued operation of the

business. The debtor was forced to turn to Equitable for funding of its operations when Hutton refused to supply further funds. Indeed, both present and future creditors benefitted as a result of this extension of credit in the millions of dollars. Evidence does not exist in this record to support the Trustee's claim that these three payments by FAMCO II to Equitable were made with the actual intent to defraud creditors. Thus, plaintiff Trustee cannot prevail under § 548(a)(1).

### (2) Section 548(a)(2)

The Trustee further argues that these three payments to Equitable were constructively fraudulent under § 548(a)(2), because FAMCO II was insolvent or was likely to become insolvent when the transfers were made and because FAMCO II "received less than a reasonably equivalent value in exchange for" the transfers.

Even if actual intent to defraud creditors is absent pursuant to § 548(a)(1), a transfer may be deemed constructively fraudulent pursuant to § 548(a)(2). A trustee in bankruptcy may avoid a transfer if the debtor

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(2).

Equitable contends that the Trustee cannot satisfy the first prong of this test, namely that FAMCO II received less than "a reasonably equivalent value" in exchange for these three payments. This Court would agree. The funds advanced by Equitable to the debtor were certainly more valuable than the mortgage loans transferred, many of which were later determined to be worthless.

In exchange for receiving prepayments, Equitable agreed to purchase mortgage loans from FAMCO II and thereby provide a line of credit to FAMCO II so that it could originate more loans and continue its business operations. The Trustee does not dispute the fact that Equitable purchased the loans in question pursuant to the MSSR nor that the debtor agreed to service the loans. When FAMCO II forwarded the prepayments and Equitable received them, each party was acting in accordance with existing rights and obligations under the contract between them. The fact that the Pickard loan was in default when it was finally paid off is simply immaterial.

With respect to the Cummings and Skafte loans, the Trustee cannot on this record point to material facts to support his contention that these payments were on account of loans which had already been paid off. The computer printout relied upon is undated, and the Trustee has offered no explanation for what "PTDO" means. Even assuming that the documents were to denote the months in which the loans were paid off, it is on its face inherently unreliable and entitled to no weight. Because the latest pay-off date on the document is October 1985, it should show that the Pickard loan had been prepaid in October 1985; instead, it shows a default. Moreover, if all these loans had already been prepaid in 1984, it was Equitable which was defrauded in 1985 when FAMCO II sold it rights to worthless loans.

Finally, the Trustee attempts to create a dispute of material fact by referring to the misspelling of the name Skafte, which appears as "Shafte" on the deposit check. However, the account numbers on the computer printout match the numbers on the deposit for the Skafte loan; indeed, the account numbers match on all three payments in issue. The dispute hardly involves a material fact.

In sum, this Court finds and concludes on the record here that all three payments in question were made by the debtor to Equitable pursuant to the terms of a valid,

contractual obligation. They are therefore not subject to avoidance by the Trustee because they were fraudulent transfers or because the debtor received less than reasonably equivalent value.

### (3) Section 548(c)

In any event, even if the debtor had the actual or constructive intent to hinder, delay, or defraud, § 548(c) makes defendant Equitable "immune" from the Trustee's power to avoid fraudulent transfers under § 548(a). Section 548(c) provides:

> Except to the extent that a transfer or obligation voidable under this section is avoidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on any interest transferred, may retain any lien transferred, or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

Thus, even if the payments to Equitable were avoidable conveyances under § 548, Equitable is protected to the extent that it gave "value" in exchange for the prepayments, and if Equitable received the payments in "good faith." As the Court's earlier discussion indicates, the Trustee cannot point to evidence in the record indicating that these three prepayments were not exchanged for "value" or that they were not received by Equitable in "good faith." On the contrary, FAMCO II did indeed receive value under the MSSR, and Equitable at all times was acting in good faith in extending further credit to the debtor in the summer and early fall of 1985.

### (c)

### Section 544(b)

The Trustee also seeks to recover the three prepayments in question on the ground that the transfers are avoidable under state law and hence are avoidable under § 544(b) of the Bankruptcy Code.

Section 544(b) authorizes a trustee in bankruptcy to avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim...." The "applicable law" for determining the rights of an unsecured creditor to avoid a transfer is state law. *In re Independent Clearing House, supra,* 77 B.R. at 863. The Trustee argues that an unsecured creditor, under the Maryland Uniform Fraudulent Conveyances Act (hereinafter "the MFCA"), could have avoided the three transfers at issue. This Court's analysis of plaintiff's claims under the MFCA is similar in most respects to the analysis already undertaken with respect to plaintiff's claims asserted under § 548 of the Bankruptcy Code.

Section 15–207 of the MFCA allows an unsecured creditor to have a conveyance set aside if it was made "with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors." The Maryland courts have explicitly required that even if a grantor has a fraudulent intent, this will not vitiate or impair a conveyance unless the *grantee* participates in the fraudulent intent. *See, e.g., Beccio v. Tawnmoore Apartments,* 265 Md. 297, 299, 289 A.2d 311 (1972); *Berger v. Hi–Gear Tire & Auto Supply,* 257 Md. 470, 475, 263 A.2d 507 (1970). This Court previously held in the *Hutton* Opinion not only that evidence did not exist to indicate that Equitable participated in Clott's fraudulent activity, 678 F.Supp. at 580–581, but that Equitable did not even have knowledge that FAMCO II had engaged in fraud. *Id.* at 577 On this record, the Trustee has failed to meet his burden of proving participation by Equitable in fraud with actual intent to defraud, hinder, or delay other creditors. *See Sullivan v. Dixon,* 280 Md. 444, 448–49, 373 A.2d 1245 (1977).

Pursuant to § 15–204, a conveyance by "a person who is or will be rendered insolvent by it is fraudulent as to creditors without regard to actual intent, if the conveyance is made or the obligation is incurred without a fair consideration." Section 15–203 provides:

> Fair consideration is given for property or an obligation, if:

(1) In exchange for the property or obligation, as a fair equivalent for it and in good faith, property is conveyed or an antecedent debt is satisfied; or

(2) The property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared to the value of the property or obligation obtained.

As earlier discussed, FAMCO II received full and fair consideration for the transfers of prepayments which it forwarded to Equitable. These transfers represented payments for mortgage loans which had been purchased by Equitable so that it might extend further credit to the debtor for the conduct of its operations. Because these transfers were made pursuant to a pre-existing contractual obligation, adequate consideration was clearly furnished by Equitable in return for these payments.

Accordingly, the Trustee's claims asserted under § 15–205 (conveyance by person in business) and under § 15–206 (conveyance by a person about to incur debts) must also fail, for these claims likewise depend on a finding of a lack of fair consideration. Because this Court has concluded that defendant Equitable gave fair consideration to FAMCO II for the payments in issue, it further concludes that summary judgment must be granted as to all of the Trustee's claims asserted under § 544(b).

(d)

*Count XXII*

■■ In Count XXII, the Trustee seeks pursuant to § 544(b) and the MFCA to avoid as fraudulent conveyances the deposits in the MH Mortgage bank account of certain checks, payable to the order of FAMCO II. These are the same 311 checks, totaling over $1.2 million, which form the basis for the Trustee's claim of conversion asserted in Count I. The Trustee has conceded that Equitable cannot be held liable under Count XXII unless it is also liable for conversion of the checks under Count I.

In view of this Court's ruling herein that Equitable is entitled to summary judgment as to Count I, this Court must likewise grant summary judgment in favor of Equitable as to Count XXII.[12]

VI

RECHARACTERIZATION AND EQUITABLE SUBORDINATION

(COUNTS III and IV)

In Counts III and IV, the Trustee seeks to recover by recharacterization and equitable subordination the value of the collateral held by Equitable pursuant to the terms of the MSSR and the WCL. Between July and November 1985,[13] Equitable advanced over $15 million to FAMCO II under the MSSR and the WCL. In return, Equitable took an outright or security interest in a large number of mortgage loans originated by FAMCO II. According to the Trustee, Equitable knew during this period that FAMCO II was grossly undercapitalized, was aware of numerous irregularities in the debtor's business including potential illegalities, and acted to effect the preferment of its own interests to the injury of other creditors of FAMCO II. The Trustee asks this Court to order Equitable to turn over to him all mortgage loans that it received from the debtor as well as all proceeds collected from those loans.

■■ Equitable subordination is a long-standing doctrine which enables a bankruptcy court, as a court of equity, to subordinate the claim of one creditor to those of other creditors in circumstances where the creditor sued has engaged in some type of inequitable conduct which has

12. Furthermore, this Court would note that even if the Trustee could show a fraudulent transfer, Equitable is not a proper party from whom the Trustee may seek recovery. *See In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1198–1200 (11th Cir.1988). Where a bank has no control over a customer's bank accounts but merely serves a conduit for funds, such a bank cannot, pursuant to § 550, be a proper "transferee" for purposes of a recovery. *Id.*

13. The Trustee submits that the critical period for evaluating Equitable's relationship with FAMCO II for purposes of Counts III and IV is that between August and November of 1985.

secured for it an unfair advantage or which has resulted in injury to other creditors of the debtor. *See, e.g., Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *L & M Realty Corp. v. Leo,* 249 F.2d 668 (4th Cir.1957). This doctrine has also been employed for the recharacterization, as unsecured capital contributions, of secured loans made by corporate insiders who are bound by their fiduciary duty to the corporation. *L & M Realty,* 249 F.2d at 670; *In re Fett Roofing & Sheet Metal Co.,* 438 F.Supp. 726, 729 (E.D.Va.1977). As both sides here recognize, the standard for recovery under a claim of equitable subordination and under a claim of recharacterization is essentially the same.[14]

■ The statutory authority for equitable subordination is 11 U.S.C. § 510(c) which provides that a court may

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

In order to establish that subordination is an appropriate remedy, the Trustee in this case must point to significant, probative facts in the record demonstrating the following three elements: (1) that Equitable engaged in some type of inequitable conduct; (2) that the misconduct conferred an unfair advantage on Equitable or resulted in injury to other creditors of FAMCO II; and (3) that equitable subordination here is not inconsistent with the provisions of the Bankruptcy Code. *Matter of Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977); *In re Beverages International, Ltd.,* 50 B.R. 273, 281 (Bkrtcy.D.Mass.1985).

■ Proof of Equitable's participation in actual fraud is not essential; any conduct, even if technically lawful, which violates rules of fair play or good conscience

can be deemed inequitable. *See, e.g., Beverages,* 50 B.R. at 281–82. As the Trustee correctly acknowledges, he must present evidence of conduct which "shocks the conscience" of this Court. *Id.*

Although much has been said in oral argument and written in memoranda by counsel for the Trustee in support of the claims asserted in Counts III and IV, the precise basis for the contention that Equitable was guilty of inequitable conduct is not clear. The Trustee apparently seeks recharacterization and equitable subordination on three grounds: (1) that Equitable used the MSSR and the WCL to mitigate its losses and afford itself an unfair advantage over other creditors of FAMCO II; (2) that the MSSR and the WCL were commercially unreasonable ventures in view of Equitable's knowledge of the debtor's business irregularities; and (3) that Equitable was an insider because it entered into a *de facto* business combination with FAMCO II pursuant to the MSSR and the WCL.

After a review of the entire record, this Court finds and concludes that summary judgment must be granted as to Counts III and IV. First, Equitable, had it in fact had knowledge of the fraudulent and criminal activities of Clott, would hardly, if it were trying to help itself to the detriment of other creditors, have loaned the debtor $13 million secured by the transfer of mortgage loans (millions of dollars of which Equitable later discovered to be worthless) and later extended another $2 million in loans to FAMCO II. As this Court noted in the *Hutton* Opinion, Equitable wanted to end its business relationship with FAMCO II at some time during 1985. However, Equitable knew that, if it abruptly stopped providing funding, FAMCO II would go bankrupt. Equitable's generous infusions of funds helped keep FAMCO afloat, and the $15 million which was advanced undoubtedly benefitted rather than injured other creditors.

---

14. Relying on 11 U.S.C. § 541(d), Equitable has argued that this Court need not reach the issue of equitable subordination because the mortgage loans in question do not constitute property of the estate but are owned by Equitable. In view of the conclusions reached herein, it is not necessary for the Court to address this issue.

The Trustee further argues that Equitable took unfair advantage of the custodial account investors in the summer of 1985. Equitable maintained custodial accounts for several institutional investors in FAMCO-originated loans, namely, Yankton Savings & Loan Association, First Federal Savings & Loan Association of Brainerd, Pioneer Federal Savings & Loan Association, and Yankee Bank for Finance & Savings. The Trustee contends that Equitable was guilty of inequitable conduct when it failed to adequately disclose that many of the loans it resold to Yankee and Pioneer were defective. These very issues were addressed by the Court in the *First Federal Savings* Opinion filed on April 5, 1988 in Civil No. H–86–301, 1988 WL 167703. In that Opinion, this Court held that Equitable had not acted fraudulently nor breached its fiduciary duty in it dealings with these institutional investors. The plaintiffs' claims of breach of contract and negligence were later scheduled for trial.[15] That Equitable may have been negligent or guilty of breach of contract in its dealings with these institutional investors would hardly constitute inequitable conduct entitling the Trustee to subordinate the mortgage loans.

In any event, Equitable had no duty to concern itself with the interests of other creditors by disclosing to them whatever information it had. *See* the *Hutton* Opinion, 678 F.Supp. at 557, 590, and the *First Federal* Opinion, slip op. at 19. It had every right in an effort to protect its own business interests to extend further credit to the debtor in an attempt to salvage a business relationship which was becoming increasingly risky.

The Trustee also contends that the WCL occurred at a time when FAMCO II was grossly undercapitalized and when no other bank, knowing what Equitable knew, would have advanced funds. Such circumstances may indeed indicate that Equitable's business decisions were ill-advised. However, these facts fall far short of establishing the type of self-dealing or otherwise inequitable conduct which courts have found necessary for recharacterization and equitable subordination. Equitable did know of irregularities in the debtor's operations, and some of its employees may even have suspected that Clott was engaging in fraudulent activities. "But knowledge of bookkeeping irregularities of a depositor or suspicions of a few employees of a large banking institution are not the equivalent of knowledge that another party doing business with the bank's depositor is being defrauded." *See* the *Hutton* Opinion, 678 F.Supp. at 580. Equitable itself was unknowingly being defrauded by Clott.[16]

Over two million dollars worth of mortgage loans transferred to Equitable pursuant to the MSSR proved to be worthless, and as conceded by counsel for the debtor at oral argument, Equitable itself has sustained a large loss as a result of its dealings with Clott. If Equitable in fact knew what the Trustee claims that it knew, Equitable certainly would not have continued to loan substantial sums to Clott and his companies. This Court has already determined as a matter of law that Equitable, like many others, was a victim of the fraud of FAMCO II and not a participant in such fraud. *Hutton, supra.* Here, the Trustee has not been able to point to material facts in this expanded record indicating that Equitable acted with an intent to defraud or with any other improper purpose.

Finally, the Trustee argues that Equitable assumed effective control over FAMCO II pursuant to the terms of the MSSR, because Equitable held and purported to own the essential business assets of FAMCO II, namely all of the remaining mortgage loans that the debtor had originated. This argument is without merit.

The record does not indicate that Equitable had anything approaching actual

---

**15.** These cases were all settled before trial, and full releases were given to Equitable by the institutional investors.

**16.** As the Court noted in the *Pappas* Opinion, Clott was a master in the art of deception and had the ability to deceive many persons and entities, including banks, savings and loan associations, auditors and investors. 690 F.Supp. at 1471.

control over the operations of FAMCO II. In language equally applicable to this case, the court in *Beverages* stated:

More than mere pressure or influence on a debtor must be shown. Monitoring operations and proffering advice to a debtor, even when coupled with a decision to withhold credit, does not rise to the level of control for purposes of equitable subordination. *See, e.g., W.T. Grant*, 699 F.2d 599 (2d Cir.1983). "In order to determine whether a creditor has assumed control the court will examine the sum of a creditor's conduct with respect to the debtor, total up all the indicia of control, and determine whether the cumulative conduct has tipped the scales." *DeNatale & Abram*, 40 Business Lawyer *supra*, at 442. Control of a corporation can be established by either stock ownership or the actual exercise of direction, management, or control. *Krivo Indus. Sup. Co. v. Nat. Distill. & Chem. Corp.*, 483 F.2d 1098, 1104 (5th Cir.1973).

50 B.R. at 282.

In this particular case, Equitable between August and November of 1985 had some say about the management and operating decisions of FAMCO II. In view of the millions of dollars loaned, Equitable was fully justified in maintaining close contact with the debtor. However, Equitable's activities amount, at best, to no more than influence and pressure on FAMCO II. They did not reach the level of actual control.

At oral argument, counsel for the Trustee advanced the surprising contention that a merger actually occurred in July of 1985 between defendant Equitable and FAMCO II. In the *Hutton* Opinion, this Court found that although there were discussions between Equitable and FAMCO II during the summer of 1985, no agreement of merger was ever reached. 678 F.Supp. at 577. Clott had falsely represented to Hutton that a partnership or other business combination had occurred, but this was only one of the many misrepresentations made by Clott to Hutton. *Id.* The record in this and other related cases establishes beyond doubt that Equitable did not control the debtor as a shareholder, partner or joint venturer and that Equitable was therefore not an insider with fiduciary obligations to other creditors.

In sum, the Trustee has not come forward with sufficient evidence of inequitable or unfair conduct on the part of Equitable in its dealings with FAMCO II to defeat the pending motion for summary judgment. Equitable's activities, although imprudent when viewed in hindsight, hardly amount to a violation of rules of fair play which would "shock the conscience" of this Court and require recharacterization or subordination. Therefore, Equitable's motion for summary judgment must be granted as to Counts III and IV.

## VII

## PREFERENCES (COUNTS VII, XIX, XX AND XXI)

Plaintiff's amended complaint contains four counts in which the Trustee seeks to avoid certain interests of Equitable as preferences pursuant to 11 U.S.C. § 547(b). These are Counts VII, XIX, XX and XXI. Section 547(b) provides, in relevant part, as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition....

### (a)

### *Count VII*

In Count VII, the Trustee attempts to avoid Equitable's setoff of the debtor's bank deposits which occurred on November 15, 1985. On this date, Equitable set-off $458,732.05 in funds maintained by FAMCO II in various checking accounts at Equitable. These funds were applied to reduce the amount owed by the debtor under

the $1.5 million loan made by Equitable to FAMCO II on October 9, 1985 as part of the WCL.

Section 553(a) provides that, subject to certain exceptions, a creditor has the right to set-off a mutual debt owing by such creditor to the debtor which arose before the filing of the bankruptcy petition against a claim of such creditor against the debtor which likewise arose before the filing. Both sides agree that a mutual debt must be in the same right and between the same parties standing in the same capacity.

 The Trustee contends that mutuality did not exist in this case. He argues that pursuant to Counts III and IV, he is entitled to equitable subordination or recharacterization of Equitable's claims and that Equitable therefore becomes the equivalent of an equity holder while the Trustee has the status of a creditor with a prior claim to these assets. As discussed herein, this Court has concluded that Equitable's motion for summary judgment should be granted as to Counts III and IV. Since the Trustee is not entitled to equitable subordination or recharacterization, his argument based on a theory of nonmutuality must be rejected.[17]

Accordingly, Equitable's motion for summary judgment must also be granted as to Count VII.

### (b)
### Count XIX

In Count XIX, the Trustee alleges that on December 1, 1985, Equitable set-off its commercial loan to FAM Servicing, Inc. (a subsidiary of FAMCO II) against the mortgage loans that it held as collateral for the commercial loan. Equitable contends that no such set-off ever occurred.

Whether or not a factual basis exists to support this claim, the Trustee has once again conceded that should the Court reject his claims of equitable subordination and recharacterization advanced in Counts III and IV, then the Trustee likewise must fail

as to Count XIX. Since the Trustee cannot prevail in Counts III and IV, defendant's motion for summary judgment must also be granted as to Count XIX.

### (c)
### Count XX

In Count XX, the Trustee seeks to recover as a preference pursuant to § 547(c)(2) the three payments made by FAMCO II to Equitable under the MSSR. These are the same three payments which are at issue in Counts IX through XVII. In seeking summary judgment as to Count XX, Equitable asserts that all three payments were made pursuant to the debtor's contractual obligations under the MSSR and that therefore, under § 547(c)(2), this claim must fail. Equitable further argues that these prepayments from FAMCO II to it were not transfers of property in which the debtor had an interest but represented contemporaneous exchanges for new value pursuant to § 547(c)(1). According to § 547(g), Equitable has the burden of proof on both these issues.

Section 547(c) provides, in pertinent part, as follows:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange of new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

---

**17.** In any event, the set-off in question clearly appears to be one involving mutual debts. Equitable set off funds existing in typical demand deposit accounts. FAMCO had borrowed money from Equitable, thus creating a debt by FAM-

CO to Equitable; FAMCO had deposited those funds with Equitable in ordinary checking accounts, thus creating a debt by Equitable to FAMCO. The Court can perceive no inequity in permitting Equitable to retain this set-off.

(C) made in the ordinary course of business or financial affairs of the debtor and transferee; and

(D) made according to ordinary business terms.

Because these three payments were placed within an ordinary checking account of FAMCO II over which the debtor had control, FAMCO II had an interest in the funds transferred to Equitable. Accordingly, property of the estate was indeed transferred.

■ Nevertheless, summary judgment in favor of Equitable is warranted under either § 547(c)(1) or (c)(2). First, under § 547(c)(1), the Trustee argues that the three payments were made on loans which were defaulted or prepaid and that therefore new value was not given by Equitable in exchange for the payments. For the reasons stated hereinabove, there is no merit to these contentions.

■ Second, with regard to § 547(c)(2), the Trustee asks the Court to disregard the terms of the MSSR because Equitable did not consistently avail itself of its right to resell mortgage loans to FAMCO. The Trustee also relies on the fact that these three payments by FAMCO II to Equitable were substantially delayed. These arguments are unavailing. Whether the payments in question were merely contemporaneous pass-throughs of borrower payments to Equitable or whether they constitute repurchases of loans by FAMCO, they were clearly authorized by provisions of the MSSR. These payments accordingly were made in the ordinary course of business pursuant to § 547(c)(2).

For these reasons, this Court must also grant summary judgment in favor of Equitable as to Count XX.

### (d)
#### Count XXI

In Count XXI (which was added by the Trustee's Third Amended Complaint), the Trustee seeks to recover that portion of the WCL which was transferred from FAMCO II to Equitable to fund overdrafts in the debtor's accounts existing as of October 9, 1985. The amount involved was some $445,000. The Trustee argues that this assignment of Equitable's security interest in certain FAMCO-originated loans converted an unsecured loan, namely the overdrafts in the FAMCO checking accounts, into a secured loan. Pursuant to § 547(b), the Trustee seeks to avoid these transfers as preferences.

In seeking summary judgment as to Count XXI, Equitable asserts: (1) that the transfers were not made on account of an antecedent debt as required by § 547(b)(2); and (2) that in any event Equitable gave unsecured new value to FAMCO II after the transfer of the security interest to Equitable pursuant to § 547(c)(4). The Trustee bears the burden of proof as to defendant's first argument, but Equitable bears the burden of proof as to the second argument. § 547(g). After due consideration of the record here, this Court must grant summary judgment in favor of Equitable on the latter ground.

It is well established that "to the extent unsecured new value is given to the debtor after a preferential transfer is made, the preference is repaid to the bankruptcy estate." *In re Prescott*, 805 F.2d 719, 731 (7th Cir.1986). The applicable statutory authority is § 547(c)(4), which states:

(c) The trustee may not avoid under this section a transfer—

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

Equitable asserts that the new value given to FAMCO II after the taking of the security interest exceeds the amount of the purported preferential transfer. Not surprisingly, the amount of the alleged preference paid to Equitable is the subject of sharp dispute. Nevertheless, the Trustee concedes that it is countering Equitable's § 547(c)(4) argument solely on the ground

that the preferences in *both* Count XX and XXI must be added together for purposes of analysis. Since this Court has determined that the Trustee is not as a matter of law entitled to prevail under Count XX, his claim under Count XXI must likewise fail.

Accordingly, this Court concludes that Equitable's motion for summary judgment must also be granted as to Count XXI.

### VIII

### EQUITABLE'S COUNTERCLAIM

Pursuant to § 553 of the Bankruptcy Code, Equitable has filed a five-count counterclaim against the Trustee, asserting a right to offset certain sums owed it against any award obtained by the Trustee in this case. Equitable contends that the five claims it has against the Trustee constitute a mutual debt pursuant to § 553.[18]

The Trustee responds that all counts of Equitable's counterclaim should be dismissed because Equitable has waived any right of set-off by failing to file a proof of claim in the bankruptcy proceedings. The Trustee further argues that Equitable cannot offset any recovery under its counterclaim against the Trustee's avoidance claims, or against the recharacterization or equitable subordination of any transfers.

 This Court would agree with those decisions which have held that failure to assert a set-off in a proof of claim in the bankruptcy case does not bar a creditor's right to assert counterclaims and set-offs pursuant to § 553 in a plenary suit. *See, e.g., In re G.S. Omni Corp.*, 835 F.2d 1317, 1319 (10th Cir.1987); *In re Sutton Investments*, 53 B.R. 226, 230 (Bkrtcy.W.D.La. 1985). As District Judge Weinfeld held in *Bernstein v. IDT Corp.*, 76 B.R. 275, 281 (S.D.N.Y.1987):

Counterclaims and set-offs may be asserted in a plenary suit notwithstanding the fact that no proof of claim had been filed in Bankruptcy Court. A creditor

may be content not to file such a claim as long as no affirmative relief is sought from it by the bankrupt, but once the Trustee asserts a claim against the creditor, equity requires that the creditor be permitted to assert authorized counterclaims.

 Nevertheless, while a creditor is entitled to assert a set-off as an affirmative defense to a trustee's claim against it even when it has not filed an appropriate proof of claim, such creditor cannot use claims of set-off to obtain an affirmative recovery against the estate. *In re Henderson*, 24 B.R. 630, 632 (Bkrtcy.M.D.Ga.1982); *see also G.S. Omni*, 835 F.2d at 1319. At oral argument, counsel for Equitable indicated that were the Court to grant summary judgment in favor of Equitable as to all counts of the Fourth Amended Complaint, Equitable would agree to a dismissal of all counts of its counterclaim. Accordingly, Equitable's counterclaim will be dismissed in its entirety.

### IX

### CONCLUSION

For all the reasons set forth herein, this Court will grant the motions for summary judgment of defendant Equitable as to each of the remaining 17 counts of Trustee's Fourth Amended Complaint. As a result, Equitable's counterclaim will be dismissed since Equitable does not seek, nor is it entitled to, any affirmative recovery against the debtor's estate. The Trustee's motion for partial summary judgment as to Count I will be denied. An appropriate Order will be entered by the Court.

---

18. Section 553 states that a creditor's pre-petition right of set-off is not affected by the Bankruptcy Code except in certain instances. The only exception applicable here is that a creditor

cannot set-off a claim that is disallowed. 11 U.S.C. § 553(a)(1). None of Equitable's claims have been disallowed, and the Trustee has filed no objection to Equitable's claims. *See* § 502.