In re McMULLEN OIL CO., Debtor.

McMullen Oil Co., Plaintiff,

v.

Crysen Refining, Inc., et al., Defendants.

Bankruptcy No. LA95–15297–SB.
Adversary No. AD97–03528–SB.

United States Bankruptcy Court, C.D. California.

June 29, 2000.

Matthew A. Lesnick, Michael Lubic, McCutchen, Doyle, Brown & Enersen, LLP, Los Angeles, CA, for McMullen Oil Co. Creditors' Trust.

Carl Grumer and Martha A. Warriner, Manatt, Phelps & Phillips, LLP, Los Angeles, CA, for Comerica Bank.

## OPINION ON SUMMARY JUDGMENT MOTIONS

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. Introduction

This adversary proceeding arises from fifteen checks that were deposited into a bank account without the indorsement of the payee. The account did not belong to the payee, but to the employee pension plan sponsored by the payee. Five checks were deposited before the payee filed this chapter 11 bankruptcy case, and ten were deposited afterwards.

This summary judgment motion raises two kinds of issues. The first set of issues involves the substantive law of check deposits: is a bank liable for accepting a check with a missing indorsement for deposit into an account other than that of the payee? The court holds that, until the bankruptcy case was filed, the debtor's president had authority to transfer to a creditor checks that were made payable to the debtor, and to cause their deposit into that creditor's account. The court finds that this is an effective defense to an action against the bank for conversion. In contrast, the court further finds that the bank is liable for negligence in accepting postpetition checks for deposit into the creditor's account without the payee's indorsement. However, the bank is not liable for the prepetition deposits, for lack of causation.

The second set of issues arises from the bank's assertion of four statutes of limitations defenses. As to the postpetition deposits, the court finds that the only applicable statute of limitations is the three-year statute for negligence under California Commercial Code § 3118(g) (West 2000) (Commercial Code).[1] This statute does not bar the claims on any of the postpetition checks because the first amended complaint, which identifies these checks for the first time, relates back to the original complaint.

### II. Facts

The McMullen Oil Co. Creditors' Trust (the Creditors' Trust) seeks to recover damages from Comerica Bank–California (Comerica) for fifteen checks made payable to debtor McMullen Oil Co. (McMullen). McMullen used each of these checks to make payments on an unsecured loan that it had previously obtained from the McMullen Oil Co. Pension Plan (the Pension Plan). Each of these checks was deposited into the bank account of the Pension Plan, a separate entity, without the payee's indorsement. In substance, McMullen transferred each check to the Pension Plan, which then deposited it in its own bank account.

The Pension Plan had a depository account at Long Beach National Bank (LBNB), Comerica's predecessor,[2] during the times relevant hereto. The name on the account was "McMullen Oil Co. Pension Plan." McMullen also maintained a general account at LBNB, under the name "McMullen Oil Co." Upon the filing of the chapter 11 case, the general account was closed pursuant to United States Trustee requirements, which mandate that a debtor's bank accounts be replaced with "debtor in possession" accounts. The Pension Plan account remained open after the filing: its closure was not required, because

---

1. The California Commercial Code is the California counterpart to the Uniform Commercial Code (UCC). While the Commercial Code has many variations from the UCC, none are relevant to this opinion.

2. LBNB was acquired by Metro Bank, which in turn was acquired by Comerica.

a pension plan is a separate legal entity, and this pension plan was not in bankruptcy.

Andrew Hopwood was the president of McMullen for approximately 25 years prior to the filing of this bankruptcy case, and continued as president of the debtor in possession at all relevant times. Prior to the filing of the bankruptcy case, Hopwood was authorized to receive, indorse and deposit checks made payable to McMullen, including the prepetition checks at issue in this adversary proceeding. Hopwood was also the trustee of the Pension Plan.

Over a period of some fourteen months, Hopwood caused fifteen checks totaling $77,963, made payable to McMullen, to be deposited into the Pension Plan account. The checks and dates of deposit are listed on Appendix A. Each of these checks was delivered to LBNB for deposit into the Pension Plan account, not into the McMullen account. Each was stamped with the indorsement of the Pension Plan. None was indorsed by McMullen. Five of these checks totaling $10,868.52 were deposited before the filing of the bankruptcy petition on March 1, 1995. The remaining ten checks totaling $67,094.48 were deposited by the debtor in possession after the bankruptcy filing.

In late 1996 McMullen's accountant discovered that a $31,493.99 check from Crysen Refining, Inc., made payable to McMullen, had been deposited into the Pension Plan's account on November 28, 1995 without McMullen's indorsement. On November 14, 1997 (a year later), the creditors' committee filed this adversary proceeding against Comerica, LBNB's successor,

seeking to recover the amount of the Crysen check, the amount of an IRS check in the amount of $4,500, and other McMullen checks that had been deposited without indorsement into the Pension Plan account. On June 15, 1998 the Creditors' Trust (the successor to the creditors' committee pursuant to the confirmed chapter 11 plan) filed its first amended complaint to recover the amounts of thirteen additional checks.

### III. Analysis

The question on this summary judgment motion is whether Comerica (as LBNB's successor) shares in the responsibility for the diversion of these funds from McMullen to the Pension Plan because LBNB accepted the checks for deposit with missing indorsements. There is no evidence that LBNB was a knowing participant in Hopwood's wrongdoing. Thus the question is what liability a depositary bank has for accepting a check for deposit into a third party account (not belonging to the payee), based solely on the fact that the check lacks an indorsement by the payee.

 A few basic concepts are useful to facilitate the discussion. A check[3] typically involves three parties, (1) the "drawer" who writes the check, (2) the "payee", to whose order the check is made out, and (3) the "drawee" or "payor bank", the bank which has the drawer's checking account from which the check is to be paid. In form, a check is an order to the drawee bank to pay the face amount of the check to the payee. After receiving the check, the payee typically indorses[4] it on the back in the payee's own name, and then deposits it in the payee's account in a

---

3. A check is a species of documents called "instruments" or "negotiable instruments." *See* Commercial Code § 3104 (UCC § 3104). In addition to checks, negotiable Instruments include promissory notes, drafts, cashier's checks, teller's checks, money orders, traveler's checks and certificates of deposit. *Id.*

4. Commercial Code § 3204(a) (UCC § 3204) provides in relevant part:

"Indorsement" means a signature ... made on an instrument for the purpose of ... negotiating the instrument....

A typical indorsement on a check consists simply in the signing of the name of the payee on the back of the check. Such an indorsement is a "blank indorsement," which converts the check into a bearer instrument which, like cash, may be negotiated by transfer of possession alone. *See* Commercial Code § 3205(b) (UCC § 3205(b)).

different bank, the "depositary bank". The depositary bank credits the check to the payee's account, and sends the check through the check clearing system to the payor bank for ultimate payment from the drawer's account. Any bank through which the check passes in the clearing process is an "intermediary bank". Any bank handling the check for collection, including the depositary bank but excluding the payor bank, is referred to as a "collecting bank." *See generally Roy Supply, Inc. v. Wells Fargo Bank*, 39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 313–15 (1995).

■ When a payee receives a check, the payee becomes its holder.[5] The payee may negotiate[6] the check by indorsing it and transferring it to another person, who then becomes its holder. In the normal course of events, a check is negotiated to a depositary bank, which then submits the check for collection through the check clearing system. If the check is indorsed in blank, it then becomes payable to bearer, and can be negotiated thereafter simply by delivery (just like cash).[7]

■ A holder who takes a check (that is regular on its face) for value, in good faith, and without notice of certain defects or defenses, becomes a holder in due course.[8] The right of a holder in due course to enforce a check is not subject to most defenses, even if the defenses might have been good against the payee.[9] Thus a holder in due course may obtain better rights in a check that its predecessor. Banks always want to be holders in due course with respect to checks that are deposited with them.

■ The payee may transfer a check, where the transfer is not a negotiation. A check is transferred[10] when it is delivered for the purpose of giving the recipient the right to enforce it. If the check is transferred without negotiation, the transferee does not become a holder, let alone a holder in due course, and usually has no better rights than its transferor.

### A. Substantive Claims Against the Bank

The Creditors' Trust alleges three substantive grounds for recovery against Comerica: (1) conversion, (2) negligence, and (3) payment of checks with fraudulent indorsements.[11]

### 1. Conversion

The Creditors' Trust (as McMullen's successor) contends that McMullen was the owner of the checks, and that LBNB

---

5. "Holder" is a defined term in the Commercial Code (and the UCC). Section 1201(2) (UCC § 1–201(2)) provides in relevant part:

> "Holder," with respect to a negotiable instrument, means the person in possession if the instrument is payable to bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession.

6. Commercial Code § 3201 (UCC § 3201) defines "negotiation" as follows:

> (a) "Negotiation" means a transfer of possession ... of an instrument by a person other than the issuer to a person who thereby becomes its holder.
> (b) ... [I]f an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder. If an instrument is payable to bearer, it may be negotiated by transfer of possession alone.

7. *See* Commercial Code § 3205(b) (UCC § 3205).

8. *See* Commercial Code § 3302(a) (UCC § 3–302(a)).

9. *See* Commercial Code § 3305(b) (UCC § 3305(b)).

10. Commercial Code § 3203(a) (UCC § 3203(a)) defines "transfer" as follows:

> An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.

11. The Creditors' Trust initially also made a claim for unauthorized postpetition transfers. However, in response to Comerica's summary judgment motion on that issue, the Trust now abandons that claim.

converted the checks by accepting them for deposit into the Pension Plan account without McMullen's indorsement.[12] When the checks were subsequently collected, the bank then obtained payment for the Pension Plan, which was not entitled to receive payment. In consequence, the Trust contends that LBNB converted the funds.

Comerica argues that it has no liability for accepting checks indorsed for deposit to someone other than the payee, if such deposits were made by an authorized agent acting within the scope of the agent's duties. Comerica further contends that Hopwood, as president of McMullen, had the authority to direct the deposit of the checks into the Pension Plan account (i.e., to transfer the funds to the Pension Plan), and that in fact he did so.

 If a check is transferred with a missing indorsement, the transferee is nonetheless intended to have the right to enforce the check. *See* Commercial Code § 3203(a). The transferee then receives the same rights as the transferor.[13] Because the payee of a check is not a holder in due course, no subsequent transferee (including a bank) can become a holder (let alone a holder in due course), unless the missing indorsement is supplied. *See Knight Pub. Co. v. Chase Manhattan Bank*, 125 N.C.App. 1, 479 S.E.2d 478, 482 (1997); JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 13–9 at 562 (3d ed.1988) ("In the case of order instruments, only the payee or one who

signs on his behalf can make the first effective indorsement and negotiate the instrument."). Nonetheless, as a nonholder in possession of the check, the transferee is a "person entitled to enforce the instrument," if the transferor had such an enforcement right. *See* Commercial Code § 3301 (UCC § 3–301).

 LBNB did not become a holder of the checks at issue, because each was missing the indorsement of the payee. When a bank receives a check with a missing indorsement, it does not receive the check by negotiation, and it is not entitled to the rights of a holder in due course. *See, e.g., Hartford Fire Ins. Co. v. Maryland Nat'l Bank*, 341 Md. 408, 671 A.2d 22, 26–27 (1996); *Kelly v. Central Bank & Trust Co.*, 794 P.2d 1037, 1042 (Colo.Ct. App.1989); *Barber v. United States Nat'l Bank*, 90 Or.App. 68, 750 P.2d 1183, 1186 (1988).[14] Thus LBNB received no better rights in the checks than the rights of its transferor, the Pension Plan.

### a. Law Applicable to Conversion of Checks

 California law governs the state law conversion claims. *Raleigh v. Illinois Dep't of Revenue*, —— U.S. ——, ——, 120 S.Ct. 1951, 1955, 147 L.Ed.2d 13 (2000) ("Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code.").[15]

---

**12.** The Creditors' Trust also contends that McMullen did not authorize the deposit of the checks in the account of the Pension Plan. However, the court finds the testimony uncontroverted that Hopwood in fact authorized these deposits.

**13.** Commercial Code § 3203(b) (UCC § 3203(b)) provides:

Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course. . . .

**14.** Because the Uniform Commercial Code was meant to make law uniform among the various jurisdictions, the California courts will generally "afford great deference to the decisions of sister jurisdictions interpreting its provisions," except where the California provisions are different. *Oswald Mach. & Equip. v. Yip*, 10 Cal.App.4th 1238, 13 Cal.Rptr.2d 193, 198 (1992).

**15.** *Cf. Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interest should be analyzed differently simply

■ Commercial Code § 3420(a) (UCC § 3420(a)) provides in relevant part:

The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment.

Under this statute, a check is converted by a bank if (a) the bank receives the check without negotiation from a person not entitled to enforce the check, or (b) the bank obtains payment on the check for a person not entitled to receive payment. The Creditors' Trust contends that LBNB is liable under both of these provisions.

■ A bank may be liable for conversion when it permits the deposit of a check into a third party's account without the indorsement of the payee. *Kelly*, 794 P.2d at 1042; *Geldert v. American Nat'l Bank*, 506 N.W.2d 22, 25–28 (Minn.1993) (dictum that 1990 amendments to UCC Article 3 permits payee to sue depositary bank for conversion for paying a check with a missing indorsement); *Stratton v. Equitable Bank*, 104 B.R. 713, 722 (D.Md.1989), *aff'd*, 912 F.2d 464 (4th Cir.1990) (applying UCC § 3419(1)(c), the predecessor to § 3420(a)).

Entirely apart from receiving the checks here at issue without negotiation, LBNB can be liable for conversion if it obtained payment on the checks for a person not entitled to enforce them or to receive payment. It is clear in this case that LBNB obtained payment on the checks on behalf of the Pension Plan.

■ This raises the issue of whether the Pension Plan was entitled to enforce

the instruments or to receive payment On them. Conversion arises under § 3405 only when the depositor is neither the payee [16] nor another person entitled to enforce the instrument, or to receive payment thereon.

## b. Pension Plan's Entitlement Enforce or to Receive Payment on the Checks

Comerica contends that it is not liable for conversion, because the Pension Plan was entitled to enforce the instruments here at issue, and to receive payment thereon. Comerica contends that McMullen transferred the checks to the Pension Plan, which made the deposits. Because of the transfers, Comerica claims, it is not liable for conversion.

■ According to Hopwood's deposition testimony, he caused the delivery of the checks here at issue to the Pension Plan. Transfer is governed by the intent of the transferor. Thus the Pension Plan obtained from McMullen the right to enforce each of the checks here at issue.

■ A depositary bank may rebut a claim for conversion based on a missing indorsement by showing that the payee whose indorsement is missing in fact transferred the instrument to the indorsing party. In *Spear v. Wells Fargo Bank (In re Bartoni–Corsi Produce, Inc.)*, 130 F.3d 857 (9th Cir.1997), the bankruptcy trustee for the payee was denied recovery against the depositary bank for conversion, where checks payable to Bartoni–Corsi were deposited into the account of Your Produce Co. The checks fell into three categories: (1) checks indorsed by both Bartoni–Corsi and Your Produce Co.; (2) checks indorsed by Your Produce Co. and also by one of Bartoni–Corsi's authorized signatories (but not by Bartoni–Corsi itself), and (3) checks indorsed only by Your

because an interested party is involved in a bankruptcy proceeding.'').

**16.** If a check is deposited by the payee into the payee's own account, the bank is not liable for conversion because the depositor is

the "person who is entitled to enforce the instrument." In this case the deposits were made by the Pension Plan, which was not the payee.

Produce Co. Bartoni–Corsi subsequently filed a bankruptcy case. Some of the deposits were made before the bankruptcy filing, and some afterwards.

In *Bartoni–Corsi* the Ninth Circuit found that all of the indorsements were adequate. After the deposit of several of the checks, Bartoni–Corsi had sold all of its assets to Your Produce Co. In consequence, pursuant to California corporation law, Your Produce Co. became the owner of the checks deposited after the sale, and properly indorsed them. *See id.* at 861. The court further found that Bartoni–Corsi had authorized in advance the pre-sale deposit of checks into the Your Produce account. *See id.* at 862. Thus, all of the checks were properly transferred to Your Produce before the Bartoni–Corsi bankruptcy, and the bank was not liable for conversion.

Similarly, in *Stratton v. Equitable Bank,* 104 B.R. 713 (D.Md.1989), *aff'd,* 912 F.2d 464 (4th Cir.1990), the bankruptcy trustee brought an action against the depositary bank for accepting checks made payable to the debtor, but deposited in the bank account of a related entity. In *Stratton,* as in this case, the deposited checks were indorsed by the depositor, but not by the payee. The court found that the bank was entitled to show that the payee's agent had actual or apparent authority to deposit the checks on behalf of the payee without the payee's indorsement. *Id.* at 724. The court found (1) that the payee of the checks gave actual authority for the deposit of the checks into the third party account, and (2) that the finances of the two entities were commingled to such an extent that tracing was not possible. *Id.* at 723. In consequence, the court found that the payee had in fact authorized the deposits into the account of

the related entity, and the bank could not be held liable for conversion for accepting these deposits with the missing indorsements.[17]

Comerica contends that it qualifies for the exception articulated in *Bartoni–Corsi* and *Stratton.* Comerica has the burden of proving that it qualifies for this exception. The court finds that Hopwood's deposition testimony, presented in connection with these summary judgment motions, shows that he, acting on behalf of McMullen, in fact authorized the transfer of the checks at issue for deposit into the Pension Plan accounts.

Thus the Pension Plan obtained from McMullen the right to enforce each of the checks here at issue. In consequence, the bank received all of the checks here at issue from a person entitled to enforce the checks, and the bank cannot be held liable for conversion under § 3420(a).

The missing indorsements are not sufficient to make LBNB liable for conversion of the checks. A bank's failure to follow reasonable commercial standards by accepting checks without the indorsement of the named payee does not make the bank liable to the payee for conversion, if the checks were deposited by an entity that was authorized by the payee to enforce the checks. *See* Commercial Code § 3420(a); *Bartoni–Corsi,* 130 F.3d at 862. Furthermore, a bank normally is not responsible to police its fiduciary accounts to assure that the fiduciary does not breach its fiduciary duties. *See, e.g., Chazen v. Centennial Bank,* 61 Cal.App.4th 532, 71 Cal. Rptr.2d 462, 464–66 (1998) (withdrawal of funds from trust account); *Desert Bermuda Properties v. Union Bank,* 265 Cal. App.2d 146, 71 Cal.Rptr. 93, 96 (1968) (same). Thus Comerica is entitled to sum-

---

**17.** The parties also argue that *Campbell v. Bank of America,* 190 Cal.App.3d 1420, 235 Cal.Rptr. 906 (1987), applies in this case. However, *Campbell* is a breach of warranty case brought by the maker of the check at issue. When a check is negotiated, an indorser warrants that the indorser has good title

to the instrument. Commercial Code § 4207(a). However, the warranty runs only to payors of the instrument, and not to the payee of the instrument, whose successor has brought the action. *See id.* Thus *Campbell* provides no help to either party in this action.

mary judgment on the claim for conversion.

## 2. Negligence

■ In addition to its claim for conversion, the Creditors' Trust also contends that LBNB was negligent in accepting the checks for deposit into the Pension Plan account with missing indorsements. California recognizes the following elements of a tort claim for negligence: (1) a legal duty to use due care; (2) a breach of the legal duty; and (3) a resulting injury for which the breach is the proximate or legal cause.[18] *See, e.g., Artiglio v. Corning,* 18 Cal.4th 604, 614, 76 Cal.Rptr.2d 479, 957 P.2d 1313 (1998); 6 B.E. Witkin, Summary of California Law § 1732 (9th ed.1988).

### a. Duty of Care

■ Absent a duty of care toward an interest of another worthy of legal protection, there can be no negligence cause of action. *Erlich v. Menezes,* 21 Cal.4th 543, 552, 87 Cal.Rptr.2d 886, 981 P.2d 978 (1999); *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.,* 49 Cal. App.4th 472, 56 Cal.Rptr.2d 756, 760 (1996). The Creditors' Trust asserts that the depositary bank LBNB owed a duty of care to McMullen, as the payee of the checks at issue, that the depositary bank breached when it accepted the checks for deposit with missing indorsements.

### i. Related Case Law

■ Under California law, a bank does not owe a duty of care to a noncustomer, absent extraordinary and specific facts. *Software Design,* 56 Cal.Rptr.2d at 760.

The court has found one reported case, from Rhode Island, which held that a depositary bank owes no duty of care to the payee of a check whose indorsement was forged, where the payee was not a customer of the bank. *See Volpe v. Fleet National Bank,* 710 A.2d 661, 664 (R.I.1998). However, in this respect a forged indorsement is different from a missing indorsement. A depositary bank typically has no way of knowing that an indorsement of a stranger to the bank is forged. In consequence, the bank cannot be charged with negligence for failure to discover the forgery. For a missing indorsement, on the other hand, the situation is different: by inspecting the indorsements alone a bank can see that an indorsement is missing.

There are several California reported opinions on related issues. In *Campbell v. Bank of America,* 190 Cal.App.3d 1420, 235 Cal.Rptr. 906, 911 (1987), the court found that the drawer of a check made a prima facie case of negligence against the payor bank (the drawee), where there was a missing indorsement. Although the bank was also the depositary bank, the court specified that the bank's exposure on the claim arose from its status as payor bank. However, the court found that the bank adequately rebutted the prima facie case of negligence by showing that the payee had authorized the indorsement by the subsequent indorser. *Id.* at 911. Thus the drawer was not entitled to recover.

In *Joffe v. United California Bank,* 141 Cal.App.3d 541, 190 Cal.Rptr. 443 (1983), the court arrived at a result similar to that in *Campbell. Joffe* was a pleading case, which was on appeal from a demurrer sustained without leave to amend. The Joffes had obtained a $25,000 check drawn by their savings and loan association against their savings account, which was

---

**18.** Prosser finds four elements to a cause of action for negligence: (1) a duty or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) failure to conform to the standard; (3) a reasonably close causal connection between the conduct and the resulting injury ("legal cause" or "proximate cause"); and (4) actual loss or damage resulting therefrom. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 30 (5th ed.1984). This analysis is essentially the same as that found in California case law:

payable to "Continental Financial Systems–Wells Fargo Escrow Trust Account." [19] After the Joffes delivered the check, it was deposited without the payee's indorsement. The Joffes were defrauded by actions of Continental Financial Systems.

The court in *Joffe* found that the depositary bank was negligent in accepting the check for deposit with a missing indorsement. The court crafted a narrow rule, applicable only where a bank accepts for deposit a check for a substantial amount, payable to an escrow, trust, or similar entity at another bank, with a missing indorsement and inadequate indicia on the face of the check regarding the subsequent indorser's authority to negotiate the instrument. In these circumstances, the court held, the risk to the drawer is sufficiently foreseeable to impose a duty on the depositary bank not to ignore the danger signals, including the missing indorsement of the payee, inherent in the attempted negotiation by the third party. *Id.* at 451–52.

Both *Campbell* and *Joffe* involved a duty of care owing by the depositary bank to the drawee of a check. Unlike those cases, McMullen was the payee, not the drawee, of the checks at issue in this case. To determine whether a bank accepting for deposit a check with a missing indorsement owes a similar duty to the payee, we must return to basic principles.

ii. **Duty of Care for Banks**

The standard of care for banks dealing with checks is set forth in Commercial Code § 3103(a)(7) (UCC § 3–104(a)(7)), which provides in relevant part:

> "Ordinary care" in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged.

California law combines the last two elements.

■ Under California case law, the chief element in determining whether a defendant owes a duty or an obligation to a plaintiff is the foreseeability of the risk. *See, e..g, Burgess v. Superior Court,* 2 Cal.4th 1064, 1072, 9 Cal.Rptr.2d 615, 831 P.2d 1197 (1992). In this case, the question is whether LBNB could reasonably foresee that the payee of the checks would suffer a loss if LBNB accepted the checks for deposit with missing indorsements.

■ The court finds that it is reasonably foreseeable that the acceptance for deposit of a check with a missing indorsement will cause harm to the payee. *Cf. Joffe,* 141 Cal.App.3d 541, 190 Cal.Rptr. 443 (1983) (holding that it was sufficiently foreseeable that the drawer of a check (that was otherwise regular but had some unusual features) would be harmed by a depositary bank's acceptance of the check with a missing indorsement, and permitting the drawer to sue the bank for negligence). The reasonable commercial standards for banks include the inspection of checks to see that they appear to be properly indorsed.

■ This standard is in accord with the basic policy grounds for imposing a duty of care. The imposition of such a duty depends on the balancing of a number of policy considerations, including the foreseeability of the harm to the plaintiff and the extent of the burden to the defendant and consequences to the community of imposing such a duty. *See, e.g., Sun 'n Sand, Inc. v. United California Bank,* 21 Cal.3d 671, 148 Cal.Rptr. 329, 346, 582 P.2d 920 (1978) (plurality opinion).

■ Where a bank's burden in shouldering a duty is minimal to avoid reasonably foreseeable losses, such a duty is proper. *Id.* This is especially true where the bank is the party best in position to avoid the loss.

**19.** The savings and loan association subsequently assigned its claim respecting the check.

■ Thus LBNB had a duty to McMullen to exercise ordinary care in inspecting the checks here at issue that were presented for deposit in the Pension Plan account, and to reject any checks that lacked McMullen's indorsement as payee.

### b. Breach

■ If a bank accepts a check for deposit that is not indorsed by the payee, the bank breaches its duty of ordinary care, as set forth in Commercial Code § 3103(a)(7). LBNB failed to exercise ordinary care by accepting the checks for deposit into the Pension Plan Account without proper indorsement. This constituted a breach of its duty to McMullen to exercise ordinary care in examining checks made payable to the order of McMullen to assure that they were properly indorsed before accepting them for deposit. Had it exercised ordinary care, LBNB would have discovered that the checks were missing the indorsement of the payee, McMullen.

■ A bank has the burden of proving that it used ordinary care in honoring forged checks or checks with missing indorsements. *See Story Road Flea Market, Inc. v. Wells Fargo Bank*, 42 Cal. App.4th 1733, 50 Cal.Rptr.2d 524, 528 (1996). In *Story Road* the bank established that it had processed the forged checks there at issue in accordance with its own check processing procedures, and that these procedures were in accord with reasonable commercial standards and with general banking practice in the community. *Id.* Comerica has provided no evidence in support of such a defense in this case.

### c. Causation

The Creditors' Trust contends that LBNB's breach of its duty to McMullen to exercise ordinary care in inspecting the fifteen checks to assure that they were properly indorsed caused McMullen to suf-

fer a loss. If LBNB had refused to deposit the checks in the Pension Plan account without proper indorsement, the Trust contends that the funds would not have been improperly deposited into that account and dispersed beyond the reach of the Trust in this case.

■ For the prepetition checks, if the bank had refused the deposits on the grounds of the missing indorsements, the court infers from the evidence presented that Hopwood would have provided the missing indorsements. McMullen had a right to decide how to pay its creditors before the bankruptcy filing, and to choose to repay the Pension Fund rather than to pay other creditors. The only limitation on this right was the possible exposure of a recipient of such a payment to a preferential transfer claim under Bankruptcy Code § 547 in case of a subsequent bankruptcy filing. Thus the court cannot find that the bank's acceptance of these checks with missing indorsements caused a loss to McMullen (that can now be pursued by the Creditors' Trust).

■ As to the postpetition deposits, on the other hand, McMullen lacked the authority altogether to transfer the funds to the Pension Plan for the purpose of repaying the prepetition debt. Once a chapter 11 bankruptcy case is filed, prepetition unsecured creditors must await the confirmation of a chapter 11 plan before they can be repaid. In making these payments, McMullen breached the fiduciary duty that it owed to creditors as a debtor in possession.[20]

A bank, however, is normally protected from any liability for such wrongdoing by a depositor. This protection arises from the holder in due course doctrine, codified in UCC § 3302 (Commercial Code § 3302). However, the bank in this case ·made a major mistake. It failed to qualify as a

---

**20.** Hopwood was understandably motivated to cause McMullen to make the repayments to the Pension Plan, notwithstanding the illegality of such payments. He was the trustee of

the Pension Plan, and was apparently prohibited by federal law from causing the loan transaction at the outset. *See* 29 U.S.C. § 1106(a)(1)(B) (West 2000).

holder in due course for the checks at issue, because it accepted them with missing indorsements. In consequence, the bank received no better right to the checks, or to the proceeds thereof, than the Pension Plan had. The Pension Plan, in turn, had no right whatever in these checks, because their transfer to the Pension Plan violated bankruptcy law.

### d. Damages

 The damages to the Creditors' Trust on its negligence claim against Comerica are $67,094.48, the sum of the ten postpetition checks improperly deposited into the Pension Plan account.

The Creditors' Trust claims that it is entitled to additional damages totaling at least $1.25 million. The Creditors' Trust claims that, during its bankruptcy case, McMullen was forced to pay an interest rate of 30% to 50% in order to obtain credit to purchase inventory. Had McMullen received the proceeds of the deposited checks, the Trust contends, McMullen would not have had to pay such exorbitant rates for trade financing and would have been adequately capitalized. In addition, as a result of McMullen's inadequate capitalization, its primary supplier of fuel cut off its trade credit, which forced McMullen to sell its operating assets at "fire sale" prices. Consequently, the Creditors' Trust claims, the bankruptcy estate was damaged by at least $1.25 million.

However, the Creditors' Trust has not show that any of these further damages were proximately caused by LBNB's negligence. The court finds that Hopwood's transfer of the funds to the Pension Plan, at a time that McMullen sorely needed the funds for other purposes, was the proximate cause of McMullen's damages, insofar as such damages exceed the face amount of the checks in question.

The Creditors' Trust points to Commercial Code § 4103(e), which would permit the Trust to prove any other damages that it suffered as a proximate cause of LBNB's negligence, if the Trust shows that LBNB acted in bad faith. However, § 4103 is inapplicable, because it applies only to a bank's "handling of an item," which is governed by Division 4 of the Commercial Code (UCC Article 4). The acceptance of checks for deposit is regulated by Division 3 (UCC Article 3), and thus does not come under the category "handling of an item."

### 3. Payment of Checks with Fraudulent Indorsements

 The Creditors' Trust also charges that LBNB paid the checks at issue over fraudulent indorsements. Where an employee fraudulently indorses a check, the rights of the parties are governed by Commercial Code § 3405.[21]

However, § 3405 is not relevant to this case. As the Official Comment[22] states,

---

**21.** Commercial Code § 3405(b) provides in relevant part:

For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes it for value or for collection, if an employer entrusted an employee with responsibility with respect to the instrument and the employee or a person acting in concert with the employee makes a fraudulent indorsement of the instrument, the indorsement is effective as the indorsement of the person to whom the instrument is payable if it is made in the name of that person. If the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instru-

ment and that failure contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.

**22.** California has not formally adopted the official comments to the UCC. However, the legislature declared that the 1993 amendments to Division 3 (Article 3 of the UCC), and related amendments to Division 1 and Division 4 (UCC Articles 1 and 4) are to be interpreted and applied in accordance with the Official Comments of the National Conference of Commissioners on Uniform State Laws. *See Edward Fineman Co. v. Superior*

this section covers only two categories of fraudulent indorsements: (a) an indorsement made in the name of the employer to an instrument payable to the employer, and (b) an indorsement made in the name of the payee of an instrument issued by the employer. *See* U.C.C. § 3405 cmt. 1 (1999).

In this case no employee forged an indorsement purporting to be that of McMullen. On all of the checks the McMullen indorsement was missing, not forged. None had the Pension Plan as the payee.

In many respects the rights of a payee against a depositary bank for accepting the deposit of a check with a missing indorsement are the same as those of a payee whose check was deposited with a fraudulent indorsement. However, this is not the kind of "fraudulent indorsement" covered by § 3405. Thus the Creditors' Trust cannot prevail on this claim.

**4. Similarity of Name on the Two Accounts**

Comerica also defends on the grounds that the names on the two accounts were sufficiently similar that Commercial Code § 3405(c) relieves it of any liability for accepting the deposits in the wrong account. Comerica argues that this defense applies to all of the causes of action.

The 1990 revision of Article 3 of the Uniform Commercial Code, adopted in 1992 by California in Commercial Code § 3405(c), provides:

Under subdivision (b), an indorsement is made in the name of the person to whom an instrument is payable if ... the instrument, whether or not indorsed, is deposited in a depositary bank to an account in a name substantially similar to the name of that person.

Subdivision (b) provides in relevant part:

For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes

it for value or for collection ... a fraudulent indorsement ... is effective as the indorsement of the person to whom the instrument is payable if it is made in the name of that person.

 The purpose of these provisions is to protect a depositary bank that accepts in good faith the deposit of a check in the account of a business where there is a minor variation between the name shown as the payee on the check and the name in the indorsement. *See, e.g., Knight Pub. Co. v. Chase Manhattan Bank,* 125 N.C.App. 1, 479 S.E.2d 478, 483 (1997) ("UCC § 3405 does not require an exact match between the payee's name and the indorsement."). For example, these provisions protect a bank in accepting a deposit in an account in the name of "ABC, Inc.", even if the payee is "ABC Corp.", "ABC Co." or "ABC Co., Inc." Comerica claims that "McMullen Oil Co." and "McMullen Oil Co. Pension Plan" qualify as "substantially similar" names under these statutory provisions.

Comerica relies on *Campbell v. Bank of America,* 190 Cal.App.3d 1420, 235 Cal. Rptr. 906 (1987), to support its contention that "McMullen Oil Co. Pension Plan" is substantially similar to "McMullen Oil Co." *Campbell* involved a series of checks made payable to the order of MVTL, a consumer loan company, for investment purposes. In exchange for each check, Campbell received a promissory note. In the first instance, the maker of the promissory note was MVTL, but in all subsequent instances the maker was MVTL–North. Campbell was unaware of the existence of MVTL–North, a real estate investment company, and did not notice that the notes were made by an entity other than MVTL.

Campbell first learned of the existence of MVTL–North when he learned that MVTL was filing for bankruptcy. At this time, he also discovered that the checks that he had drawn payable to MVTL had been indorsed by MVTL–North and were

*Court,* 66 Cal.App.4th 1110, 78 Cal.Rptr.2d 478, 484 (1998).

deposited into an account of MVTL–North. The court found that the bank was not liable for accepting these deposits, because the indorsements and deposits had been authorized by the chief executive officer shared by the two companies.

Despite the similarity in names of MVTL and MVTL–North in *Campbell,* the court did not rely on this similarity in deciding the case. Moreover, *Campbell* was decided before the 1992 revision that added § 3405(c) to the Commercial Code. Thus *Campbell* provides no assistance to Comerica on this issue.

 In this case the court finds that the name of the account into which the checks were deposited was not substantially similar to the name of the payee on the checks. "McMullen Oil Co. Pension Plan" cannot be characterized as "substantially similar" to "McMullen Oil Co." Like a trust account or escrow account, a bank is required to know that a pension plan is a different entity, which must have bank accounts separate from those of the business to which it relates.[23] If the words "pension plan" appear in the name of a depositor, such a name cannot be considered substantially similar to a name lacking these words. Thus the alleged similarity of names on the two accounts provides no defense to Comerica.

### B. Statutes of Limitations

We next address the statutes of limitations defenses. Comerica raises four statutes of limitations in defense of these actions, and contends that they support its motion for summary judgment.[24] First, Comerica argues that the action is barred in full or in part by Commercial Code § 4406, which precludes an action for forgery or unauthorized signature after one year from the date when a sufficiently detailed statement of account is sent to the customer. Second, Comerica contends that the action is barred by California Code of Civil Procedure (CCP) § 340(3) (West 2000), which imposes a similar one-year limitation on an action based on an unauthorized indorsement. Finally, Comerica invokes the three-year statutes of limitations in Commercial Code §§ 3118(g) and 4111 for conversion and negligence.

 The primary purpose of statutes of limitations is to prevent the assertion of stale claims, where evidence is no longer fresh and witnesses are no longer available. *See, e.g., Addison v. California,* 21 Cal.3d 313, 146 Cal.Rptr. 224, 226, 578 P.2d 941 (1978). The right to be free of stale claims eventually comes to prevail over the right to prosecute them. *Telegraphers v. Railway Express Agency,* 321 U.S. 342, 349, 64 S.Ct. 582, 88 L.Ed. 788 (1944). Such statutes serve a distinct public purpose, by preventing the assertion of demands that, through the unexcused lapse of time, have become difficult or impossible to defend. *Addison,* 146 Cal. Rptr. at 226, 578 P.2d 941; *see also* James M. Fischer, *The Limits of Statutes of Limitations,* 16 Sw.U.L.Rev. 1, 1–2 (1986). The law favors those who act quickly and have not slept on their rights. *See* 3 B.E.

---

**23.** A pension plan, such as the one here at issue, is established pursuant to the Employee Retirement Security Act of 1972, which is codified in 29 U.S.C. §§ 1001–1461 (West 1999). In form, a pension plan is a trust. *See id.* § 1103. The assets of such a plan are managed by one or more fiduciaries who are named in the plan instrument. *See id.* § 1102(a). Such a fiduciary is required by federal statute to discharge his or her duties solely in the interest of the participants and beneficiaries of the plan, according to standards established by federal statute. *See id.* § 1104(a).

**24.** Comerica also argues that Bankruptcy Code § 549(d) 11 U.S.C. § 549(d) (West 2000), imposes a two-year statute of limitations on an action by a trustee to avoid a postpetition transfer of property of the estate that is not authorized by the Bankruptcy Code or by the court. Comerica argues that it is not a transferee of the checks within the meaning of § 549, and that issue is conceded by the Creditors' Trust. Thus no § 549 issue remains for determination.

WITKIN, CAL. PROCEDURE *Actions* § 408, at 513–14 (4th ed.1996).

## 1. Relation Back

Before examining the individual statutes of limitations that Comerica claims, we turn to the question of whether the first amended complaint, which identifies thirteen checks not specified in the original complaint, relates back to the date of the filing of the original complaint. If the first amended complaint does not relate back, each applicable statute of limitations continued to run as to these thirteen checks until the date of the first amended complaint.

 The relation back of an amended pleading in an adversary proceeding is governed by Rule 15(c) of the Federal. Rules of Civil Procedure, incorporated by reference in Rule 7015 of the Federal Rules of Bankruptcy Procedure. Rule 15(c) provides in relevant part:

An amendment of a pleading relates back to the date of the original pleading when

. . .

(2) the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. . . .

An amendment that restates the original claim with greater particularity or amplifies the details of the transaction alleged in the preceding pleading falls within Rule 15(c), and relates back to the date of the original complaint. *See* 6A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1497 (2d ed.1990).

 The court finds that the first amended complaint in this case relates back to the date of filing of the original complaint, because all the deposits specified in the first amended complaint were generally alleged in the original complaint. The original complaint specifically states in paragraph 17:

The Committee believes that other checks intended for the Debtor may have also been improperly deposited into one or more bank accounts controlled by the Pension Plan.

This allegation was clearly sufficient to put Comerica on notice that the thirteen additional checks were at issue in this litigation. *Cf. Siegel v. Converters Transp., Inc.,* 714 F.2d 213, 214–15 (2d Cir.1983) (first amended complaint charging the collection of illegal shipping charges related back to original complaint that specified illegal shipping charges over a more limited time period.).

This case clearly differs from *Pereira v. Hong Kong & Shanghai Banking Corp. (In re Kam Kuo Seafood Corp.),* 67 B.R. 304, 306 (Bankr.S.D.N.Y.1986), which involved an original complaint attacking one payment as preferential, and an amended complaint adding seven more payments. Unlike this case, in *Kam Kuo* there was nothing in the original complaint to indicate that the plaintiff intended to recover the additional payments that were subsequently discovered.

The Creditors' Committee also argues that the applicable statutes of limitations are tolled because it was not able to discover sooner the deposit of the checks with missing indorsements. Because of the court's ruling on the relation back issue, it does not reach the issue of equitable tolling.

## 2. Specific Statutes of Limitations

We turn now to an examination of the specific statutes of limitations that Comerica contends apply to the transactions here at issue.

### a. California Commercial Code § 4406(f)

Commercial Code § 4406(f) provides:

Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer . . . discover

and report the customer's unauthorized signature on ... the item is precluded from asserting against the bank the unauthorized signature.

Comerica argues that § 4406(f) bars McMullen's claim because, except with respect to the Crysen check, McMullen failed to notify Comerica of any irregularity in the indorsements on the checks within one year following the mailing of the statement.

■ Section 4406 is not per se a statute of limitations, but instead is an issue-preclusion statute. *See Roy Supply, Inc. v. Wells Fargo Bank,* 39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 317–18 (1995). Unlike a statute of limitations, it does not purport to bar an action against a bank. Rather, it simply precludes a customer from asserting a forgery or alteration against the bank if the customer has failed to discover and report the forgery or alteration to the bank. *Id.*

■ Section 4406 codifies and adds specificity to duties that have long been imposed upon a customer with respect to a payor bank, which is the depositor's own bank. *Id.* This statute imposes a duty on a customer to examine a bank statement (if the bank provides one) to determine that "items paid" are properly charged against the customer's account. *See* § 4406(a); *Edward Fineman Co. v. Superior Court,* 66 Cal.App.4th 1110, 78 Cal.Rptr.2d 478, 482–83 (1998); *Story Road Flea Market v. Wells Fargo Bank,* 42 Cal.App.4th 1733, 50 Cal.Rptr.2d 524 (1996) (holding, under pre–1990 version of § 4406(f), that it precluded the customer from asserting that certain checks were forged, because the customer failed to discover the forgeries and notify the bank timely); *Roy Supply,* 46 Cal.Rptr.2d at 317; *Sun'n Sand, Inc. v. United California Bank,* 21 Cal.3d 671, 148 Cal.Rptr. 329, 349, 582 P.2d 920 (1978) (plurality opinion).

■ Section 4406(f) provides no assistance to Comerica, because Comerica and its predecessors were not payor banks for any of the checks here at issue. This action is not against any of the payor banks for the fifteen checks. In addition, the bank account statements did not go to McMullen: they went to the Pension Fund, the owner of the deposit account.

Furthermore, this adversary proceeding does not involve any of the predicate acts that invoke liability under § 4406. This proceeding does not involve "items paid" and charged against the account. In addition, it does not involve signatures that were unauthorized, or alterations in the amounts of items paid.

Instead, this case is brought against the depositary bank. Section 4406 does not govern such a claim. In consequence, its one-year issue preclusion rule does not apply.

**b. California Code of Civil Procedure § 340(3)**

■ CCP § 340(3) imposes a one-year statute of limitations on an action by a depositor based upon an unauthorized indorsement. Like § 4406, § 340(3) is inapplicable because McMullen does not fit within the terms of the statute.

Section 340(3) imposes a one-year statute of limitations for:

> [a]n action ... by a depositor against a bank for a payment of a forged or raised check, or a check that bears a forged or unauthorized endorsement....

Section 340(3) differs from § 4406 in that § 4406 only requires the customer to notify the bank of the forgery within one year, while § 340(3) requires that the customer commence suit within one year. Insofar as these statutes are inconsistent, § 4406 is the applicable provision. *See Roy Supply v. Wells Fargo Bank,* 39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 312–13 (1995).

Section 340(3) only applies to a claim by a depositor. *See Creditors Collection Serv. v. Castaldi,* 38 Cal.App.4th 1039, 45 Cal.Rptr.2d 511, 513 (1995) (finding § 340(3) inapplicable to claim by bank against depositor). The checks in this

case were indorsed by the Pension Plan, and deposited in the Pension Plan account. Thus the Pension Plan, and not McMullen, is the depositor. In consequence, § 340(3) does not apply to bar this action by the Creditors' Trust, McMullen's successor.[25]

### c. California Commercial Code §§ 3118(g) and 4111

Section 3118(g) provides the relevant statute of limitations for conversion of a check. Section 3118(g) states:

> an action ... for conversion of an instrument ... or ... to enforce an obligation, duty, or right arising under this division ... shall be commenced within three years after the cause of action accrues.

■ The negligence cause of action in this litigation is based on Commercial Code § 3103(a)(7). Thus the residual language of § 3118(g) provides a three-year statute of limitations for the negligence claim. *Accord, Schall v. Gilbert*, 741 A.2d 286 (Vt.1999) (cashing of certificate of deposit). All of the postpetition checks fall within this limitations period, after giving effect to the relation back of the first amended complaint. Thus the complaint is timely as to all of them, and they are not barred by the applicable statute of limitations.

Perhaps out of the abundance of caution, Comerica also invokes the three-year statute of limitations in Commercial Code § 4111. However, that statutory provision applies only to claims arising under Division 4 of the Commercial Code. No such claims have been made in this adversary proceeding.

The court has found that Comerica is not liable on the conversion claim. Thus it is not necessary to address the applicable statute of limitations for conversion of checks.

### IV. Conclusion

The court finds that Comerica is liable to the Creditors' Trust for negligence as to the postpetition checks. Comerica's predecessor LBNB accepted these checks, which were payable to McMullen, for deposit into the Pension Plan's account with missing indorsements. The court finds that Comerica has no negligence liability for the deposit of the prepetition checks, because of lack of causation. The court finds that Comerica has no liability on the cause of action for conversion, because McMullen, acting through its president Hopwood, authorized the transfer of the checks to the Pension Fund, which then made the deposits.

The court finds that Commercial Code § 3118(g) provides the applicable statute of limitations, which is three years. The first amended complaint relates back to the date of the filing of the original complaint. Accordingly, all of the postpetition deposits fall within the three-year statute of limitations.

In consequence, the Creditors' Trust is entitled to recover $67,094.48, the sum of the postpetition checks. The Trust is not entitled to recover any other elements of damage.

#### Appendix

| Deposit Date | Payor | Amount |
|---|---|---|
| 10/11/94 | McMullen Oil Company Station Account | 5,000.00 |
| 12/12/94 | State of California | 800.00 |
| 1/11/95 | Gary E. Hickman, Attorney at Law Trust Account | 411.28 |
| 1/12/95 | Thorson & Associates | 592.10 |

---

**25.** Furthermore, § 340(3) may be limited to a forged or raised check, or a check that bears a forged or unauthorized indorsement. *See Union Tool Co. v. Farmers & Merchants Nat'l Bank*, 192 Cal. 40, 218 P. 424 (1923) (finding that statute applied because checks at issue were raised and indorsements were forged).

It is uncertain whether the principle, that the acceptance of a check with a missing indorsement is the legal equivalent of the acceptance of a check with a fraudulent indorsement, makes § 340(3) applicable to checks with missing indorsements. The court has found no case law on this issue.

| | | |
|---|---|---|
| 1/12/95 | U.S. Treasury | 4,065.14 |
| 3/14/95 | Fireman's Fund Ins. Co. | 750.00 |
| 5/2/95 | Santa Monica Bank | 41.61 |
| 5/11/95 | Blackburn Oil Co. | 500.00 |
| 6/11/95 | Credit Managers Ass'n. of California | 1,336.84 |
| 7/21/95 | Southern California Edison Co. | 256.05 |
| 8/1/95 | Santa Monica Bank | 42.07 |
| 8/9/95 | Bank of America (Cashier's Check) | 20,087.12 |
| 9/1/95 | U.S. Treasury | 12,421.80 |
| 11/28/95 | Crysen Refining, Inc. | 31,493.99 |
| 1/2/96 | American Star Insurance Co. in Liquidation | 165.00 |